**EXHIBIT "1"**

*2000 U.S. Dist. LEXIS 7804, *

LEONARD HUNT, Plaintiff, -against- MEHARRY MEDICAL COLLEGE and THE NATIONAL BOARD of MEDICAL EXAMINERS, Defendants.

98 Civ. 7193 (MBM)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2000 U.S. Dist. LEXIS 7804

June 6, 2000, Decided
June 8, 2000, Filed

**DISPOSITION:** [*1] Defendants' motion to dismiss Hunt's amended complaint granted in part and denied in part. Hunt's cross-motion to file second amended complaint granted.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** Defendant medical school and examining board moved to dismiss plaintiff's amended complaint alleging that he was discriminated against in violation of 29 U.S.C.S. § 794 of the Rehabilitation Act of 1973 and Title III, 42 U.S.C.S. § 12182-12189, of the Americans with Disabilities Act.

**OVERVIEW:** Plaintiff alleged that defendant medical school and examining board discriminated against him in connection with a standardized test. Defendants moved to dismiss plaintiff's claims under 29 U.S.C.S. § 794 of the Rehabilitation Act of 1973 (RA) and the Americans with Disabilities Act (ADA). The court converted defendants' motion into a summary judgment motion and reserved judgment on part of plaintiff's RA claim because the parties referred to matters outside the pleadings. Plaintiff's remaining RA and ADA claims were time-barred to the extent they depended on defendant examining board's failure to quadruple the time that plaintiff was given to take an examination because plaintiff failed to bring the claim within three years of defendant's refusal to grant plaintiff's request. To the extent his claims depended on his having been compelled to take and pass the examination by a certain date, they were similarly time-barred. The breach of settlement agreement claim was dismissed because plaintiff failed to plead waiver of performance or to allege facts establishing such waiver. Plaintiff's cross-motion to file an amended complaint was granted.

**OUTCOME:** Motion to dismiss granted in part because plaintiff's disability discrimination claims were time-barred and plaintiff failed to plead waiver of performance or to allege sufficient facts to establish waiver in breach of contract claim; judgment was reserved on remaining Rehabilitation Act claims since court converted request to motion for summary judgment.

**CORE TERMS:** accommodation, time-barred, limitations period, quadruple, Mem of Law, notice, interfere, settlement agreement, punitive damages, state law, pro se, quotation marks, citations omitted, accrue, double time, rest period, state cause of action, cause of action, personal injury, refusal to provide, discriminatory, collecting, converted, breached, stricken, funding, letter dated, Disabilities Act, Rehabilitation Act, discriminatory act

**LEXISNEXIS(R) HEADNOTES**

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims
HN1 ⟱ For the purpose of deciding a party's Fed. R. Civ. P. 12(b) motion, the material facts alleged in the amended complaint are taken as true.

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims
Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview

Civil Procedure > Summary Judgment > Supporting Materials > General Overview
*HN2* When the parties reference matters outside the pleadings in a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the court has two options. First, the matters may be excluded from consideration and the motion to dismiss may be decided on the basis of the pleadings alone. Second, the Rule 12(b)(6) motion may be converted into a Fed. R. Civ. P. 56 summary judgment motion, with both parties entitled to submit supporting materials before judgment is rendered. Converting the Rule 12(b)(6) motion into a Rule 56 motion is the preferable course when the issue as to which matters outside the pleadings have been submitted is discrete and dispositive.

Civil Procedure > Pleading & Practice > Pleadings > Complaints > General Overview
Civil Procedure > Parties > Self-Representation > Pleading Standards
Governments > Courts > Clerks of Court
*HN3* For statute of limitations purposes, a party's action is initiated on the date his complaint is received by the pro se office, not on the date the complaint is filed by the pro se office with the clerk of the court.

Civil Procedure > Pleading & Practice > Pleadings > Amended Pleadings > Relation Back
Criminal Law & Procedure > Accusatory Instruments > General Overview
*HN4* As to whether a plaintiff's amended complaint relates back to his original complaint, when both complaints concern the same conduct and the original complaint plainly put defendants on notice as to the additional claims that are now pressed in the amended complaint, under federal law the amended complaint relates back to the original complaint such that it must be regarded as having been filed on the date that the original complaint was filed.

Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Affirmative Defenses
*HN5* When Congress has not established a time limitation for a federal cause of action, the settled practice has been to adopt a time limitation from an analogous state cause of action.

Governments > Legislation > Statutes of Limitations > Time Limitations
Labor & Employment Law > Discrimination > Disability Discrimination > Federal & State Interrelationships
*HN6* Claims under 29 U.S.C.S. § 794 of the Rehabilitation Act of 1973 are governed by the state statute of limitations applicable to personal injury actions. In New York, the personal injury limitations period is three years. N.Y. C.P.L.R. 214(5) (McKinney 1999).

Governments > Legislation > Statutes of Limitations > Time Limitations
Labor & Employment Law > Discrimination > Disability Discrimination > Federal & State Interrelationships
*HN7* Although the length of the limitations period under 29 U.S.C.S. § 794 of the Rehabilitation Act of 1973 is fixed by state law, federal law governs the question of when the claim accrues and the limitations period begins to run. Under federal law, a claim accrues when the plaintiff knows or has reason to know of the allegedly injury-causing act. Thus, in a discrimination case the proper focus is on the time of the discriminatory act, not the point at which the consequences of the act become painful.

Labor & Employment Law > Discrimination > Disability Discrimination > Federal & State Interrelationships
*HN8* A claim under 29 U.S.C.S. § 794 of the Rehabilitation Act of 1973 accrues when the plaintiff knew or should have known about the allegedly injury-causing act, not when the last possibility of the act being undone has passed.

Civil Procedure > Remedies > Damages > Punitive Damages
Governments > Courts > Authority to Adjudicate
*HN9* The United States Supreme Court has determined that absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute.

Civil Procedure > Remedies > Damages > Punitive Damages
Civil Rights Law > Protection of Disabled Persons > Rehabilitation Act > Remedies
Labor & Employment Law > Discrimination > Disability Discrimination > Remedies > General Overview

*HN10* Since 1992, most federal courts have held that punitive damages are available under 29 U.S.C.S. § 794 of the Rehabilitation Act of 1973 because the Act contains no clear direction to the contrary. The United States District Court for the Southern District of New York follows those federal courts in holding that punitive damages are available under 29 U.S.C.S. § 794.

Civil Procedure > Jurisdiction > General Overview
Civil Rights Law > Public Facilities > Remedies
Labor & Employment Law > Discrimination > Disability Discrimination > Remedies > General Overview
*HN11* Under 42 U.S.C.S. § 12188(a)(1) of the Americans with Disabilities Act (ADA), the "remedies and procedures" under Title III, 42 U.S.C.S. §§ 12182-12189, of the ADA are the remedies and procedures set forth in 42 U.S.C.S. § 2000a-3(a), and although 42 U.S.C.S. § 2000a-3(c) requires prior notice, 42 U.S.C.S. § 2000a-3(a) does not. These statutory provisions are wholly unambiguous. A plaintiff is not required to notify state or local authorities before filing his Title III of the ADA claim in federal court.

Governments > Legislation > Statutes of Limitations > Time Limitations
Labor & Employment Law > Discrimination > Disability Discrimination > Federal & State Interrelationships
*HN12* The Americans with Disabilities Act (ADA) does not specify the period within which claims under Title III, 42 U.S.C.S. §§ 12182-12189, of the ADA must be brought.

Governments > Legislation > Statutes of Limitations > Time Limitations
Labor & Employment Law > Discrimination > Disability Discrimination > Federal & State Interrelationships
Torts > Procedure > Statutes of Limitations > General Overview
*HN13* The appropriate limitations period for a disability discrimination claim is provided by New York's personal injury cause of action, N.Y. C.P.L.R. Law § 214(5) (McKinney 1999). Therefore claims under Title III, 42 U.S.C.S. §§ 12182-12189, of the Americans with Disabilities Act must be brought within three years of accrual.

Civil Rights Law > Protection of Disabled Persons > Americans With Disabilities Act > Remedies
Labor & Employment Law > Discrimination > Disability Discrimination > Remedies > General Overview
*HN14* The remedies available under Title III, 42 U.S.C.S. §§ 12182-12189, of the Americans with Disabilities Act are those that are available under 42 U.S.C.S. § 2000(a)(3)(a). 42 U.S.C.S. § 12188(a)(1). Under 42 U.S.C.S. § 2000(a)(3)(a), damages are unavailable to private plaintiffs. Therefore, damages are also not available to private plaintiffs under Title III.

Civil Rights Law > Protection of Disabled Persons > Americans With Disabilities Act > Scope
*HN15* 42 U.S.C.S. § 12203(b) states that it shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of any right granted or protected by the Americans with Disabilities Act.

Governments > Legislation > Interpretation
*HN16* Where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words.

Civil Rights Law > General Overview
Family Law > Family Protection & Welfare > Dependent & Disabled Adults > Services
Public Health & Welfare Law > Social Services > Disabled & Elderly Persons > General Overview
*HN17* Under 45 C.F.R. § 84.4(b)(4), a recipient of federal financial assistance may not, directly or through contractual or other arrangements, utilize criteria or methods of administration that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap or that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons.

Civil Rights Law > General Overview
Trademark Law > Likelihood of Confusion > Similarity > Appearance, Meaning & Sound > General

Get a Document - by Citation - 2000 U.S. Dist. LEXIS 7849

Case 7:07-cv-03689-WCC Document 40-2    Filed 02/15/2008    Page 5 of 30    Page 4 of 11

Overview
*HN18* The continuing violations doctrine applies only to claims of discriminatory acts committed under an ongoing policy of discrimination such that multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation.

Contracts Law > Breach > Causes of Action > General Overview
*HN19* The general rule is that a plaintiff may not show waiver of performance of a contract without pleading the same and alleging the facts and circumstances constituting the waiver.

**COUNSEL:** For Meharry Medical College, Defendant: MARC J. GOTTRIDGE, ESQ., JOSEPH J. MACCHIAROLA, ESQ., Corbin Silverman & Sanseverino LLP, New York, NY.

For The National Board of Medical Examiners, Defendant: PAUL J. FISHMAN, ESQ., LANCE J. GOTKO, ESQ., Friedman Kaplan & Seiler LLP, New York, NY.

LEONNARD HUNT, plaintiff, Pro se, St. Albans, NY.

For LEONNARD HUNT, plaintiff: Steve Stavridis, Riverdale, NY.

For MEHARRY MEDICAL COLLEGE, defendant: Richard E. Jackson, Corbin, Silverman & Sanseverino, LLP, New York, NY.

**JUDGES:** Michael B. Mukasey, U.S. District Judge.

**OPINION BY:** Michael B. Mukasey

 **OPINION**


OPINION and ORDER

MICHAEL B. MUKASEY, U.S.D.J.

Leonard Hunt, formerly a medical student at Meharry Medical College ("the College"), alleges that he was discriminated against on the basis of a disability in connection with a standardized test administered by The National Board of Medical Examiners ("the Board"). Hunt claims that the Board violated Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 **[*2]** (1994) ("the RA" or " § 504"), and Title III of the Americans with Disabilities Act, 42 U.S.C. § 12182-12189 (1994) ("the ADA" or "Title III"). In addition, Hunt claims that the College violated these statutory provisions and also breached a settlement agreement that it had entered into with him.

Pursuant to Fed. R. Civ. P. 12(b)(1) and 12(b)(6), each defendant moves to dismiss Hunt's amended complaint. Hunt cross-moves to file a second amended complaint. For the reasons stated below, defendants' motions are granted in part and denied in part, and Hunt's motion is granted.

I.

*HN1* For the purpose of deciding defendants' Rule 12(b) motions, the material facts alleged in the amended complaint are taken as true. *See Cooper v. Pate*, 378 U.S. 546, 546, 12 L. Ed. 2d 1030, 84 S. Ct. 1733 (1964) (per curiam). Hunt has epilepsy and glaucoma. (Am. Compl. P 2) He became a medical student at the College in 1980, and was a student there in 1987, when he filed a complaint with the United States Department of Health and Human Services ("HHS") alleging that the College was discriminating against him because of his physical ailments. (*Id.* PP 5, 7) The complaint **[*3]** was resolved by a 1988 settlement agreement, and Hunt continued his studies. (*Id.* P 8)

Hunt completed his required coursework in 1992. (*Id.* P 6) He was informed by a letter dated February 3, 1995 that he would be ineligible to receive an M.D. degree from the College unless he passed the two-day United States Medical Licensing Examination ("the Examination" or "the test") when it was next offered -- on August 30-31, 1995. (*Id.* P 8) The Examination is administered by the Board. (*Id.* P 9)

Before the test, Hunt asked the Board for a quadruple time accommodation -- *i.e.*, that he be allowed to take the test over eight days. (Compl. Ex. B) The Board told Hunt that he would be given only "double time," and that therefore he would have to complete the test in four days. (*Id.* Ex. C at 1)

On August 30, 1995, Hunt sat for the Examination, and that evening he had a seizure. (Am. Compl. P 12) The next morning, Hunt reported to his physician, who concluded that he "'should not continue the examination . . . (without proper rest).'" (*Id.* P 14) (quoting Hunt's doctor, ellipses in the amended complaint) Hunt then called the Board and asked for a two-day rest period so **[*4]** that he could recuperate before continuing with the Examination. (*Id.* P 18) The Board said no, and Hunt failed the test. (*Id.* PP 19-20) By letter dated October 24, 1995, the College told Hunt that because he had not passed the Examination he was being dismissed and would not receive an M.D. degree. (*Id.*)

Hunt's complaint was received by the *pro se* office on August 29, 1998 or August 31, 1998, [1] and was filed with the clerk of the court on October 13, 1998. (Compl. at 1) On July 28, 1999, Hunt -- now represented by an attorney -- filed an amended complaint. (Am. Compl. at 1)

### FOOTNOTES

[1] On the complaint, "August 31, 1998" has been partially effaced, and "August 29, 1998" has been stamped over it. For the purpose of this opinion I will assume *arguendo* that the complaint was filed on August 29, 1998.

## II. Hunt's Claims Against the Board

### A. The RA Claim

Hunt contends that the Board violated the RA (1) because it did not provide him with a quadruple time accommodation, and (2) because the Board denied **[*5]** his request for a two-day rest period. (*Id.* PP 17, 48-49)

Pursuant to Fed. R. Civ. P. 12(b)(6), the Board moves to dismiss Hunt's RA claim. The basis of this motion is a declaration that the Board is not a "program . . . receiving Federal financial assistance" within the meaning of the Act. (8/15/99 Mem. of Law at 6-7) (citing Golden Decl. PP 12-19) In his Memorandum of Law, Hunt argues that the Board accepts federally funded vouchers as payment for its testing fees. (10/5/99 Mem. of Law at 6-8)

Both the declaration and Hunt's references to a voucher program are matters outside the pleadings. *See Fonte v. Board of Managers of Continental Towers Condominium*, 848 F.2d 24, 25 (2d Cir. 1988). [HN2] Accordingly, this court has two options: first, these matters may be excluded from consideration and the motion to dismiss may be decided on the basis of the amended complaint alone; or second, the Rule 12(b)(6) motion may be converted into a Rule 56 summary judgment motion, with both parties entitled to submit supporting materials before judgment is rendered. *See, e.g., Friedl v. New York*, 210 F.3d 79, 2000 WL 353210, at *3 (2nd Cir. 2000) (describing **[*6]** these options). Converting the 12(b)(6) motion into a Rule 56 motion is the preferable course when the issue as to which matters outside the pleadings have been submitted is "discrete and dispositive." 2 James Wm. Moore et al., *Moore's Federal Practice* § 12.34[3][b] (3d ed. 1999).

Here, both criteria are met. The narrow issue of whether the Board receives federal funding is discrete -- there will be little overlap between the evidence submitted as to the Board's funding and the evidence that will likely be submitted in connection with other aspects of this litigation. Moreover, the funding issue is dispositive of whether the RA governs the Board's conduct. Accordingly, the Board's Rule 12(b)(6) motion is converted into a Rule 56 motion. Judgment will be reserved until the parties have had an opportunity to

submit further materials.

The Board argues also that the § 504 claim is in part time-barred. Before considering this argument, three preliminary matters require discussion. *HN3* First, for statute of limitations purposes, Hunt's action was initiated on the date his complaint was received by the *pro se* office (August 29, 1998), not on the date the complaint was filed by **[\*7]** the *pro se* office with the clerk of the court (October 13, 1998). *See Toliver v. Sullivan*, 841 F.2d 41, 42 (2d Cir. 1988).

*HN4* Second, as to whether Hunt's amended complaint relates back to his original complaint, both complaints concern the same conduct. Moreover, the original complaint plainly put defendants on notice as to the additional claims that are now pressed in the amended complaint. *Compare, e.g.*, Compl. P 1 ("this suit is brought . . . pursuant to Title III of the Americans with Disabilities Act, which incorporates by reference [§ 504 of the RA]") *with* Am. Compl. P 1 ("this action is brought pursuant to [§ 504 of the RA and] Title III of the Americans with Disabilities Act"). Accordingly, under federal law the amended complaint relates back to the original complaint such that it must be regarded as having been filed on August 29, 1998. ² *See* 3 Moore et al., *supra*, § 15.19[1]-[2] (discussing Fed. R. Civ. P. 15(c)).

## FOOTNOTES

2 Because subject matter jurisdiction in this case is not founded on 28 U.S.C. § 1332 (1994), I need not decide whether Hunt's amended complaint relates back to his original complaint under state law, even though it is state law, *see infra* at 7, that determines the length of the § 504 limitations period. *See Gleason v. McBride*, 869 F.2d 688, 693 (2d Cir. 1989) (in a § 1331 case, applying the federal Rule 15(c) relation back standard as to a federal cause of action the period of limitations for which is supplied by state law); *see generally Burgos Martinez v. Rivera Ortiz*, 715 F. Supp. 419, 422-23 (D.P.R. 1989).

**[\*8]** Third, the RA does not indicate the period during which a § 504 claim may be brought. *HN5* "When Congress has not established a time limitation for a federal cause of action, the settled practice has been to adopt a . . . time limitation" from an analogous state cause of action. *See Wilson v. Garcia*, 471 U.S. 261, 266, 85 L. Ed. 2d 254, 105 S. Ct. 1938 (1985). In *Morse v. University of Vt.*, 973 F.2d 122 (2d Cir. 1992), the Circuit Court held that *HN6* § 504 claims are governed by the state statute of limitations applicable to personal injury actions. *See id.* at 127. In New York, the personal injury limitations period is three years. *See* N.Y. C.P.L.R. § 214(5) (McKinney 1999).

*HN7* Although the length of the § 504 limitations period is fixed by state law, federal law governs the question of when the § 504 claim accrues and the limitations period begins to run. *See Morse*, 973 F.2d at 127. Under federal law, a claim accrues when the plaintiff "knows or has reason to know" of the allegedly injury-causing act. *See id.* at 125 (internal quotation marks and citations omitted). Thus, in a discrimination case "the **[\*9]** proper focus is on the time of the *discriminatory act*, not the point at which the *consequences* of the act become painful." *Chardon v. Fernandez*, 454 U.S. 6, 8, 70 L. Ed. 2d 6, 102 S. Ct. 28 (1981) (emphasis in original) (citing *Delaware State College v. Ricks*, 449 U.S. 250, 258, 66 L. Ed. 2d 431, 101 S. Ct. 498 (1980) (internal quotation marks and other citations omitted); *see also Morse*, 973 F.2d at 125 ("the timeliness of a discrimination claim is measured from the date the claimant receives notice of the allegedly discriminatory decision") (internal quotation marks and citations omitted).

The Board argues that Hunt's RA claim is time-barred to the extent that it depends on its refusal to grant a quadruple time accommodation. Attached to Hunt's complaint is a letter dated July 18, 1995, which states that the "reasonable accommodation [that] will be provided for the [Examination] . . . is double time[,]" not the "quadruple time" that Hunt had requested. (Compl. Ex. C at 2) Hunt had read and understood the letter by August 16, 1995 at the latest. (*Id.* Ex. D at 2) (8/21/95 Letter from the Board to Hunt) (noting that **[\*10]** Hunt and a representative of the Board had discussed a "previously approved accommodation of double time" during an August 16, 1995 telephone call) By that date, Hunt "had reason to know" that he would not be receiving a quadruple time accommodation. Accordingly, to the extent that it is based on the Board's refusal to provide such an accommodation, Hunt's § 504 claim accrued on August 16, 1995 and became time-barred on August 17, 1998 -- more than one week before he filed his complaint.

Resisting this conclusion, Hunt contends that an August 21, 1995 letter shows that the Board was "amenable" to granting his request up to the date of the Examination. Hunt argues that his claim did not accrue until August 30, 1995, when the test began and it became clear that he would not be receiving quadruple time. However, there was nothing tentative or equivocal about the July 18 letter. It was a flat statement of the Board's position. *HN8* Moreover, a claim accrues when the plaintiff knew or should have known about the allegedly injury-causing act, not when the last possibility of the act being undone has passed. *See Ricks*, 449 U.S. at 260-61. Hunt's argument fails.

Finally, the **[*11]** Board maintains that punitive damages are not available under § 504, and that Hunt's request for such damages should therefore be stricken from the amended complaint. The RA does not state whether punitive damages are available under § 504, and neither the Supreme Court nor our Circuit Court has reached this issue. Before 1992, many federal courts held that punitive damages could not be awarded under § 504. *See Moreno v. Consolidated Rail Corp.*, 99 F.3d 782, 790 (6th Cir. 1996) (collecting cases). However, in 1992 the Supreme Court held that *HN9* "absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." *Franklin v. Gwinnett County Pub. Schs.*, 503 U.S. 60, 70-71, 117 L. Ed. 2d 208, 112 S. Ct. 1028 (1992). *HN10* Since 1992, most federal courts have held that punitive damages are available under § 504 because the RA contains no "clear direction to the contrary." *See, e.g., Rodgers v. Magnet Cove Pub. Schs.*, 34 F.3d 642, 644 (8th Cir. 1994); *Waldrop v. Southern Co. Servs., Inc.*, 24 F.3d 152, 157 (11th Cir. 1994); **[*12]** *Pandazides v. Virginia Bd. of Educ.*, 13 F.3d 823, 832 (4th Cir. 1994); *Saylor v. Ridge*, 989 F. Supp. 680, 690 (E.D. Pa. 1998); *Burns-Vidlak v. Chandler*, 980 F. Supp. 1144, 1152 (D. Haw. 1997); *Hernandez v. Hartford*, 959 F. Supp. 125, 134 (D. Conn. 1997); *Kilroy v. Husson College*, 959 F. Supp. 22, 24 (D. Me. 1997); *Garrett v. Chicago Sch. Reform Bd. of Trustees*, 1996 U.S. Dist. LEXIS 10194, No. 95 C 7341, 1996 WL 411319, at *4 (N.D. Ill. July 19, 1996); *Zaffino v. Surles*, 1995 U.S. Dist. LEXIS 4225, No. 91 Civ. 1637 (MGC), 1995 WL 146207, at *2-3 (S.D.N.Y. Mar. 31, 1995); *Simenson v. Hoffman*, 1995 U.S. Dist. LEXIS 15777, No. 95 C 1401, 1995 WL 631804, at *7 (N.D. Ill. Oct. 24, 1995); *DeLeo v. Stamford*, 919 F. Supp. 70, 73 (D. Conn. 1995); *Mild v. Mehlville Public Sch. Dist.*, 1995 U.S. Dist. LEXIS 22190, No. 4:93 CV2392 (JCH), 1995 WL 819138, at *7 (E.D. Mo. Sept. 18, 1995); *Kedra v. Nazareth Hosp.*, 868 F. Supp. 733, 740 (E.D. Pa. 1994). This line of cases conforms to *Franklin*, and I will follow it. Punitive damages are available under § 504.

B. The ADA Claim

Hunt contends that the Board violated Title **[*13]** III of the ADA precisely as it did § 504 of the RA -- by providing only a double time accommodation, and by denying his request for a rest period. (Am. Compl. PP 52-58) In response, the Board makes three arguments.

First, the Board argues that "prior notice" to state or local officials is a jurisdictional prerequisite to filing a Title III claim in federal court, and that because Hunt did not provide such notice, subject matter jurisdiction may not be exercised over his claim. There is authority that supports the Board's argument. *See, e.g., Snyder v. San Diego Flowers*, 21 F. Supp. 2d 1207 (S.D. Cal. 1998). However, *HN11* under 42 U.S.C. § 12188(a)(1), Title III's "remedies and procedures" are "the remedies and procedures set forth in [42 U.S.C.] section 2000a-3(a)," and although § 2000a-3(c) requires prior notice, § 2000a-3(a) does not. *Compare* 42 U.S.C. § 2000a-3(c) (describing notice requirement) *with* 42 U.S.C. § 2000a-3(a) (not mentioning a notice requirement). These statutory provisions are wholly unambiguous. Hunt was not required to notify state or local authorities before **[*14]** filing his Title III claim in federal court. *Accord, e.g., Botosan v. Fitzhugh*, 13 F. Supp. 2d 1047, 1050 (S.D. Cal. 1998) ("Congress . . . expressly adopted subsection (a). It seems unlikely that Congress would absentmindedly forget to adopt a provision [*i.e.*, subsection (c)] that appears a mere two paragraphs below the subsection it adopted."); *Doukas v. Metropolitan Life Ins. Co.*, 1997 U.S. Dist. LEXIS 21757, *7, No. Civ. 4-478- SD, 1997 WL 833134, at *3 (D.N.H. Oct. 21, 1997) ("reading Congress's designation of 2000a-3(a) to include the other paragraphs of section 2000a-3 would render the designation of paragraph (a) superfluous"); *see generally Sharp v. Waterfront Restaurants*, 1999 U.S. Dist. LEXIS 15376, *7, No. 99- CV-200 TW (AJB), 1999 WL 1095486, at *3 (S.D. Cal. Aug. 2, 1999) (noting that "the vast majority of district courts that have passed on the question have held that . . . Congress did not intend to incorporate the notification requirements contained in subsection (c)") (collecting cases).

Second, the Board argues that Hunt's RA claim is time-barred to the extent that it depends on the Board's refusal to provide a quadruple time accommodation. *HN12* The ADA does not specify the period **[*15]**

within which Title III claims must be brought. Accordingly, a limitations period must be borrowed from an analogous state cause of action, *see supra* at 7, and neither the Supreme Court nor our Circuit Court has determined what that state cause of action should be.

*HN13* The appropriate limitations period is provided by New York's personal injury cause of action, *see* N.Y. C.P.L.R. Law § 214(5) (McKinney 1999), and therefore Title III claims must be brought within three years of accrual. First, because the RA and the ADA are substantially similar statutes, the limitations period that applies under *Morse* to § 504, *see supra* at 7, should apply also to Title III. *Cf. Everett v. Cobb County Sch. Dist.*, 138 F.3d 1407, 1409 (11th Cir. 1998) ("Because causes of action brought under Title II of the ADA and the Rehabilitation Act are essentially identical, we will . . . apply the same statute of limitations to both."); *Duprey v. Connecticut Dep't of Motor Vehicles*, 191 F.R.D. 329, 341 (D. Conn. 2000) (same). Second, the rationale of *Morse* was that both § 504 and 42 U.S.C. § 1983 (1994) have "broad, remedial goals," encompass **[*16]** a "wide diversity" of claims, and are part of the "general corpus of discrimination law." *Morse*, 973 F.2d at 126-27. The *Morse* Court thus held that state personal injury limitations periods, which govern § 1983 actions under *Wilson v. Garcia*, 471 U.S. at 266, should apply also to RA claims. *See Morse*, 973 F.2d at 127. Like § 504 and § 1983, Title III has "broad, remedial goals," encompasses a "wide diversity" of claims, and is part of the "general corpus of discrimination law." Therefore, under the logic of *Morse* Title III claims must be brought within the three-year period that applies to § 1983 actions. *Accord, e.g., Soignier v. American Bd. of Plastic Surgery*, 92 F.3d 547 (7th Cir. 1996) (holding that Title III claims are governed by the state limitations period applicable to personal injury actions), *Doukas v. Metropolitan Life Ins. Co.*, 882 F. Supp. 1197 (D.N.H. 1995) (same); *Independent Hous. Servs. of San Francisco v. Fillmore Ctr. Assocs.*, 840 F. Supp. 1328 (N.D. Cal. 1993) (same).

Hunt's Title III claim and his § 504 claim share the same factual predicate, and **[*17]** both claims must be brought within three years of accrual. Therefore, the conclusion that Hunt's RA claim is in part time-barred, *see supra* at 8, is controlling, and Hunt's ADA claim is similarly time-barred to the extent that it is based on the Board's refusal to provide a quadruple time accommodation.

Third, the Board contends that Hunt's request for damages should be stricken from the amended complaint because damages can not be awarded under Title III. As noted above, *HN14* the remedies available under Title III are those that are available under 42 U.S.C. § 2000(a)(3)(a). *See* 42 U.S.C. § 12188(a)(1). Under § 2000(a)(3)(a), damages are unavailable to private plaintiffs. *See Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 401-02, 19 L. Ed. 2d 1263, 88 S. Ct. 964 (1968). Therefore, damages are also not available to private plaintiffs under Title III. *See, e.g., Proctor v. Prince George's Hosp. Ctr.*, 32 F. Supp. 2d 820, 824 (D. Md. 1998); *Jairath v. Dyer*, 972 F. Supp. 1461, 1465 (N.D. Ga. 1997) (collecting cases), *vacated on other grounds*, 154 F.3d 1280 (11th Cir. 1998); **[*18]** *see also* 135 Cong. Rec. 19,855 (1989) (remarks of Senator Harkin, chief Senate sponsor of the ADA) ("Title III . . . expressly limits relief to equitable remedies").

Hunt argues that damages are recoverable "under Title IV of the ADA in cases where a party 'discriminate[s] against any individual because such individual has opposed any act or practice prohibited by the [ADA]' or 'interfere[s] with any individual in the exercise or enjoyment . . . of any right granted or protected by the ADA.'" (10/5/99 Mem. of Law at 14-15) (quoting 42 U.S.C. § 12203(a) and § 12203(b)) (brackets in plaintiff's memorandum) However, there is no reference to Title IV in the amended complaint, and with good reason: Hunt has not stated a claim for its violation. Nor is there any suggestion in either of the complaints that the Board retaliated against Hunt, *i.e.*, that Hunt "opposed" an act prohibited by the ADA and that the Board discriminated against him because of this opposition.

Hunt's contention that damages are available to him under § 12203(b) necessarily rests on the assumption that an entity "interfere[s]" with a person in the exercise of his ADA rights **[*19]** whenever it violates those rights. Otherwise, there could be no plausible basis for arguing from § 12203(b) that damages are available in a case such as this one, in which little more is alleged than that plaintiff asked for an accommodation and defendant refused to provide it.

However, this expansive interpretation of "interfere[s]" is untenable. First, Hunt's reading would create a contradiction between Title III and § 12203(b). Under Title III, damages are not available to a private plaintiff simply because he is improperly denied a requested accommodation. *See supra* at 15. However, under Hunt's interpretation of § 12203(b) damages are available in precisely that situation.

Second, Hunt's interpretation focuses on the word "interfere[s]" without reference to its context. **HN15** Section 12203(b) states that "it shall be unlawful to *coerce, intimidate, threaten, or interfere* with any individual in the exercise or enjoyment of . . . any right granted or protected by [the ADA]." 42 U.S.C. § 12203(b) (emphasis added). **HN16** "Where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar **[*20]** in nature to those objects enumerated by the preceding specific words." 2A Sutherland, *Statutes and Statutory Construction* § 47.17 (5th ed. 1991). Here, this canon requires construing "interfere" with reference to "coerce," "intimidate," and "threaten" such that "interfering" with a person means doing something more than merely violating his ADA rights -- something like "coercing," "intimidating," or "threatening" him in the exercise of those rights. In this case, there is no allegation that the Board did anything of the kind.

### III. Hunt's Claims Against the College

Hunt claims that the College violated both § 504 and Title III by (1) requiring him to pass the Examination by a certain date; (2) permitting students who failed the Examination to graduate with an M.D., but not allowing Hunt to do so "because . . . [he] filed a complaint" with HHS in 1987; (3) dismissing Hunt based on the results of the Examination, which the College "knew [was] taken without the benefit of reasonable accommodations"; and (4) denying his "request to have the aforesaid violations reversed." (Am. Compl. PP 24-35) Moreover, Hunt claims that the College breached the 1988 settlement agreement because **[*21]** that agreement "mandated that [the College] . . . count[] only accommodated attempts." (*Id.* P 38) In response, the College makes four arguments.

First, the College contends that the ADA claim must be dismissed because Hunt did not notify state or local authorities before filing his complaint. I have already rejected this argument. *See supra* at 12.

Second, the College asserts that Hunt has not stated either an RA claim or an ADA claim because the Board, and not the College, administers the Examination. However, the College was not absolved of its responsibilities under the relevant statutes simply because it did not itself administer the Examination. **HN17** *See* 45 C.F.R. § 84.4(b)(4) ("A recipient [of federal financial assistance] may not, directly *or through contractual or other arrangements*, utilize criteria or methods of administration (i) that have the effect of subjecting qualified handicapped persons to discrimination on the basis of handicap, [or] (ii) that have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the recipient's program with respect to handicapped persons[.]") (emphasis added); *see also id.* **[*22]** § 84.44(c). 3

### FOOTNOTES

3 The above-referenced regulations concern the RA. Hunt contends that these regulations apply also to the ADA. (10/5/99 Mem. of Law at 15) (citing 42 U.S.C. § 12201(a)) The College does not dispute this contention, and thus has conceded the point.

Third, the College argues that the RA and ADA claims are time-barred because they accrued on February 13, 1995, when the College told Hunt that he would not receive a degree unless he passed the Examination the next time it was offered. In support of this argument, the College contends that the letter was an act within the meaning of *Ricks*, and that what followed between Hunt and the College was merely a consequence of that act.

To the extent that Hunt's RA and ADA claims are based on the College's forcing him to take and pass the Examination by a certain time (Am. Compl P 15, 28(b)), this argument is valid and Hunt's claims are time-barred. However, Hunt's other allegations -- that he was not given a rest period and **[*23]** that he was retaliated against -- can not be characterized as consequences of his having been required to pass the Examination by a particular date. These allegations do not depend on the February 13, 1995, letter, and to the extent that Hunt's ADA and RA claims are derived from these allegations they are not time-barred. 4

### FOOTNOTES

4 Hunt argues that the College violated § 504 and Title III on a "continuing" basis such that none of his claims are time-barred. *HN18* However, the "continuing violations" doctrine applies only to "claims of discriminatory acts committed *under an ongoing policy of discrimination* . . . [such that] multiple incidents of discrimination, even similar ones, that are not the result of a discriminatory policy or mechanism do not amount to a continuing violation." *Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir. 1998) (internal quotation marks and citation omitted; emphasis in original). Here, Hunt has not alleged that the College's actions were the product of a discriminatory mechanism, or that they were part of an ongoing policy of discrimination.

[*24] Fourth, the College argues that it is not liable for breach of the 1988 settlement agreement because Hunt breached another portion of the agreement, which required him to complete his coursework years before he allegedly did so. *Compare* Settlement Agreement P 11 (stating that Hunt's academic requirements must be completed by December 31, 1990) *with* Am. Compl. P (stating that Hunt's academic requirements were completed "in or around January 1992"). In response, Hunt contends that the College "expressly waived [this] condition" and thus cannot rely upon it. (10/5/99 Mem. of Law at 17) *HN19* However, "the general rule . . . is that a plaintiff may not show waiver of performance without pleading the same and alleging the facts and circumstances constituting the waiver." *R.J. Marshall, Inc. v. Turner Constr. Co.*, 139 N.Y.S.2d 55, 58 (Sup. Ct. 1955) (citation omitted); *see also* 22A N.Y. Jur. Contracts § 370. In this case, Hunt has neither pleaded waiver of performance, nor alleged any of the facts that purportedly establish that there has been such a waiver. Anticipating this difficulty, Hunt notes that he has composed the proposed second amended complaint to avoid [*25] this problem. (11/5/99 Mem. of Law at 18) However, such revisions are irrelevant to the question of whether the amended complaint contains allegations as to waiver of performance. It does not. Accordingly, the breach of contract claim must be dismissed.

IV. Hunt's Cross-Motion

Hunt filed his original complaint *pro se*, and in March 1999, an attorney took Hunt's case on a *pro bono* basis and filed the amended complaint. Defendants filed their Rule 12(b) motions, and "in preparing the opposition thereto, [Hunt] related to [his attorney] additional information that supported the assertion of . . . additional claims." (10/5/99 Mem. of Law at 19) Hunt now moves to file a second amended complaint that contains the "additional information . . . [and] additional claims."

I see no reason to deny the motion. There are no allegations that Hunt or his attorney dragged their feet or have proceeded in bad faith; defendants do not contend that they will be prejudiced by the filing of another complaint; and although Hunt has already filed two complaints, as he was permitted to do as of right under Fed. R. Civ. P. 15(a), only one of those complaints was filed with the benefit of an attorney. [*26] Accordingly, Hunt's motion to file a second amended complaint is granted. 5 *See generally Foman v. Davis*, 371 U.S. 178, 182, 9 L. Ed. 2d 222, 83 S. Ct. 227 (1962) (holding that leave to amend should be "'freely given'" unless there is an "apparent reason" for not doing so, "such as undue delay, bad faith or dilatory motive on the part of the movant [or] . . . undue prejudice to the opposing party") (quoting Fed. R. Civ. P. 15(a)).

**FOOTNOTES**

5 Defendants argue that Hunt's "additional claims" are not meritorious. *See, e.g.*, (10/10/99 Mem. of Law) (making this argument). If a defendant believes that such is the case, it is free to file a motion to dismiss the second amended complaint.

* * *

For the reasons stated above, the Board's Rule 12(b) motions are granted in part and denied in part as follows: (1) its Rule 12(b)(6) motion to dismiss the RA claim is converted into a summary judgment motion and judgment is reserved (*supra* at 5); (2) the RA and ADA claims are time-barred to the extent that [*27] they depend on the Board's failure to provide "quadruple time" (*supra* at 8, 14) (3) the motion to strike Hunt's request for punitive damages as to his RA claim is denied (*supra* at 9); (4) the Rule 12(b)(1) motion

Get a Document - by Citation - 2000 U.S. Dist. LEXIS 7804    Page 11 of 11

Case 7:01-cv-03686-WCC    Document 8-2    Filed 02/15/2008    Page 12 of 30

to dismiss the ADA claim is denied; and (5) Hunt's request for damages as to his ADA claim is stricken (*supra* at 15).

The College's Rule 12(b) motions are granted in part and denied in part as follows: (1) the Rule 12(b)(1) motion to dismiss the ADA claim is denied (*supra* at 18); (2) the Rule 12(b)(6) motion to dismiss the RA and ADA claims for failure to state a claim is denied (*supra* at 18); (3) the RA and ADA claims are time-barred to the extent that they depend on Hunt's having been compelled to take and pass the Examination by a certain date (*supra* at 19); (4) the breach of contract claim is dismissed without prejudice (*supra* at 21).

Finally, Hunt's cross-motion to file a second amended complaint is granted (*supra* at 22).

SO ORDERED:

Dated: New York, New York

June 6, 2000

Michael B. Mukasey,

U.S. District Judge

Service:   **Get by LEXSEE®**
Citation:  **2000 U.S. Dist. LEXIS 7804**
View:   Full
Date/Time:  Friday, February 15, 2008 - 2:55 PM EST

* Signal Legend:
● -   Warning: Negative treatment is indicated
🆀 -   Questioned: Validity questioned by citing refs
⚠ -   Caution: Possible negative treatment
◆ -   Positive treatment is indicated
Ⓐ -   Citing Refs. With Analysis Available
❶ -   Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

 **LexisNexis**   About LexisNexis  | Terms & Conditions  | Contact Us
Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*2000 U.S. Dist. LEXIS 8553, ***

SECURITIES AND EXCHANGE COMMISSION, Plaintiff, -against- RICHARD M. SIMONSON, Defendant.

96 Civ. 9695 (MBM)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2000 U.S. Dist. LEXIS 8553

June 13, 2000, Decided
June 19, 2000, Filed

**DISPOSITION:** [*1] Simonson's motion to dismiss denied and judgment reserved as to the SEC's motion for summary judgment.

**CASE SUMMARY:**

**PROCEDURAL POSTURE:** In an action alleging violation of the Securities Act of 1933 (Securities Act), 15 U.S.C.S. §§ 77q(a)(1),(3), defendant moved to dismiss the action pursuant to Fed. R. Civ. P. 12(b)(6), and the plaintiff Securities and Exchange Commission cross-moved for partial summary judgment as to defendant's liability for violations of the Securities Act.

**OVERVIEW:** Plaintiff Securities and Exchange Commission (SEC) claimed that defendant's purchase program was a false and misleading offer to sell securities, and that by mailing it defendant violated the Securities Act of 1933 (Securities Act), 15 U.S.C.S. §§ 77q(a)(1),(3), and was about to violate other federal securities laws. Defendant moved to dismiss the action pursuant to Fed. R. Civ. P. 12(b)(6), and the SEC cross-moved for partial summary judgment as to defendant's liability for violations of the Securities Act. The defendant's motion referred to matters outside the pleadings, which the court decided not to consider. The court then held that because there was no support for the argument that a communication did not constitute an offer simply because it was accompanied by a non-disclosure agreement, the motion to dismiss was denied. The court, noting that defendant was appearing pro se, decided that it would reserve judgment on the SEC's motion until it had an opportunity to apprise defendant of the effect of summary judgment.

**OUTCOME:** Defendant's motion to dismiss was denied. Furthermore, the court, noting that defendant was appearing pro se, decided that it would reserve judgment on the SEC's motion until it had an opportunity to apprise defendant of the effect of summary judgment.

**CORE TERMS:** summary judgment, Securities Act, deposition testimony, factual allegation, pro se, offer to sell, matters outside, unsworn, mailed, reasons stated, reserved, discrete, recipient

**LEXISNEXIS(R) HEADNOTES**
Civil Procedure > Pleading & Practice > Defenses, Demurrers, & Objections > Failures to State Claims
Civil Procedure > Summary Judgment > General Overview
*HN1* ⊥ Converting a Fed. R. Civ. P. 12(b)(6) motion into a Fed. R. Civ. P. 56 motion is the preferable course when the issues as to which matters outside the pleadings have been submitted are "discrete and dispositive."

Civil Procedure > Parties > Self-Representation > General Overview
Civil Procedure > Summary Judgment > Motions for Summary Judgment > General Overview
Civil Procedure > Summary Judgment > Supporting Materials > General Overview
*HN2* ⊥ With regard to a motion for summary judgment, the court may not consider unsworn statements and unattached documents, and summary judgment therefore may not be resisted on the basis of

them.

**COUNSEL:** CARMEN J. LAWRENCE, ESQ., Regional Director, Securities and Exchange Commission, ROBERT KNUTS, ESQ., New York, NY, for plaintiff.

Richard M. Simonson, Defendant, pro se, New York, NY.

**JUDGES:** Michael B. Mukasey, U.S. District Judge.

**OPINION BY:** Michael B. Mukasey

**OPINION**

OPINION and ORDER

MICHAEL B. MUKASEY, U.S.D.J.

In 1995, defendant *pro se* Richard Simonson allegedly drafted a "Bank Instrument Purchase Program" ("purchase program"), and mailed it to at least four people. (*Id.*) Plaintiff Securities and Exchange Commission claims that the purchase program was a false and misleading offer to sell securities, and that by mailing it Simonson (1) violated the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77q(a)(1),(3) (1994), and (2) is about to violate other federal securities laws. (*Id.*)

Simonson moves to dismiss the action pursuant to Fed. R. Civ. P. 12(b)(6), and the SEC cross-moves for partial summary judgment as to Simonson's liability for violations of the Securities Act. For the reasons stated below, Simonson's motion is denied and **[*2]** judgment is reserved as to the SEC's motion.

I.

Attached to Simonson's motion to dismiss is a letter which he claims was mailed with the purchase program. It states, *inter alia*, that the program is "not a firm offering." (6/4/99 Letter from Simonson to the Court at 4) The motion also refers to deposition testimony, and contains an unsupported factual allegation -- namely, that Simonson instructed a recipient of the purchase program to "deal [only] with non-regulated organizations . . . over which the SEC does not exercise any jurisdiction." (*Id. passim*)

The letter, deposition testimony, and factual allegation are matters outside the pleadings. See *Kopec v. Coughlin*, 922 F.2d 152, 155 (2d Cir. 1991) (attached document); *Rivera-Ramos v. Roman*, 156 F.3d 276, 280 (1st Cir. 1998) (deposition testimony); *Fonte v. Board of Managers*, 848 F.2d 24, 25 (2d Cir. 1988) (factual allegation). Accordingly, this court has two options: first, these matters may be excluded from consideration and the motion to dismiss may be decided on the basis of the complaint alone; or second, the Rule 12(b)(6) motion may be converted into a Rule 56 summary **[*3]** judgment motion, with both parties entitled to submit supporting materials before judgment is rendered. See, e.g., *Friedl v. New York*, 210 F.3d 79, 83 (2nd Cir. 2000) (describing these options). *HN1* Converting the Rule 12(b)(6) motion into a Rule 56 motion is the preferable course when the issues as to which matters outside the pleadings have been submitted are "discrete and dispositive." *Hunt v. Meharry College*, 2000 U.S. Dist. LEXIS 7804, 98 Civ. 7193 (MBM), 2000 WL 704681 (June 6, 2000) (quoting 2 James Wm. Moore et al., *Moore's Federal Practice* § 12.34[3][b] (3d ed. 1999)).

Here, these criteria are not met. The matters outside the pleadings concern (1) whether the program documents were an offer to sell securities, and (2) whether Simonson mailed them with scienter. These broad issues are not "discrete"; they are at the heart of this litigation, and there is substantial overlap between the evidence that is relevant to them and the evidence that would likely be submitted as to other aspects of the case. Accordingly, I will not convert the Rule 12(b)(6) motion but rather will decide it, excluding from consideration the letter, deposition testimony, and factual allegation.

[*4]  Construed liberally, Simonson's motion contains one argument that does not depend entirely on these matters -- his claim that the purchase program was not an offer to sell because it required recipients to "not divulge any of the details of the . . . transaction." (6/4/99 Letter from Simonson to the Court at 3) However, there is no support for the argument that a communication does not constitute an offer simply because it is accompanied by a non-disclosure agreement. Therefore, Simonson's motion to dismiss is denied.

II.

As to plaintiff's motion, Simonson argues that the SEC has "misstated" some facts, and that therefore there are genuine issues of material fact that preclude summary judgment. (Background Summary P 2) This argument is based in part on unsworn statements and documents that are not attached to an affidavit. *See, e.g., id.* P 1 (describing "defendant's intention for creating the program" without reference to supporting authority and in an unsworn document); *id.* P 6 (referring to letter quoted at *supra* page 1, which is not attached to an affidavit). Because Simonson is proceeding *pro se*, I must apprise him of two facts before ruling on the SEC's motion:  [*5]  first, *HN2* the court may not consider unsworn statements and unattached documents, and summary judgment therefore may not be resisted on the basis of them, *see Macklin v. Butler*, 553 F.2d 525, 528 n.1 (7th Cir. 1977); and second, if the SEC prevails on its motion for summary judgment, Simonson will be liable for violating the Securities Act. *See generally Sawyer v. American Fed. of Gov. Employees*, 180 F.3d 31, 34-36 (2d Cir. 1999) (describing scope of District Court's duties to *pro se* non-movants); *Graham v. Lewinski*, 848 F.2d 342, 344 (2d Cir. 1988) (same). Accordingly, I will reserve judgment on the SEC's motion.

* * *

For the reasons stated above, Simonson's motion to dismiss is denied and judgment is reserved as to the SEC's motion for summary judgment.

SO ORDERED:

Dated: New York, New York

June 13, 2000

Michael B. Mukasey,

U.S. District Judge

Service:    **Get by LEXSEE®**
Citation:   **2000 U.S. Dist. LEXIS 8553**
View:       Full
Date/Time:  Friday, February 15, 2008 - 2:56 PM EST

* Signal Legend:
● -  Warning: Negative treatment is indicated
Q -  Questioned: Validity questioned by citing refs
⚠ -  Caution: Possible negative treatment
◆ -  Positive treatment is indicated
A -  Citing Refs. With Analysis Available
i -  Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.

 LexisNexis·   About LexisNexis  | Terms & Conditions  | Contact Us
Copyright © 2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.

*2007 U.S. Dist. LEXIS 21269, *; 73 Fed. R. Evid. Serv. (Callaghan) 331*

ROBERT NOVAK D/B/A PETSWAREHOUSE.COM, Plaintiff, VERSUS TUCOWS, INC., OPENSRS AND NITIN NETWORKS, INC., Defendants.

No 06-CV-1909 (JFB) (ARL)

UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF NEW YORK

2007 U.S. Dist. LEXIS 21269; 73 Fed. R. Evid. Serv. (Callaghan) 331

March 26, 2007, Decided
March 26, 2007, Filed

**CORE TERMS:** domain, forum selection clause, com, declaration, petswarehouse, forum-selection, venue, internet, website, citation omitted, evidentiary hearing, registrar, registration, hearsay, web, public policy, personal knowledge, transferred, trademark, confirmation, email, printout, assent, Lanham Act, unconscionable, authenticated, admissible, reseller, disputed, printed

**COUNSEL:** [*1] Plaintiff appears Pro se.

For Defendant Tucows is represented by Glenn Matthew Mitchell, Esq., Schwimmer Mitchell Law Firm, Mount Kisco, New York.

For Defendant Nitin is represented by Gary Adelman, Esq., Adelman & Lavania, LLC, New York, New York.

**JUDGES:** JOSEPH F. BIANCO, United States District Judge.

**OPINION BY:** JOSEPH F. BIANCO

**OPINION**

MEMORANDUM AND ORDER

JOSEPH F. BIANCO, District Judge:

*Pro se* plaintiff Robert Novak ("Novak") brings the present action against defendants Tucows, Inc. and its subsidiary, OpenSRS [1] (collectively, "Tucows") and Nitin Networks, Inc. ("Nitin") (collectively, "defendants"), alleging that defendants' transfer of his internet domain name, "petswarehouse.com," constituted trademark infringement and trademark dilution in violation of the Lanham Act, 15 U.S.C. § 1114, 1117, 1125(a) & 1125 (c). Plaintiff also brings pendent state claims, including: conversion, negligence, bailee breach of duty, bailee breach of trust, negligent misrepresentation, breach of contract, tortious interference and intentional infliction of emotional distress.

**FOOTNOTES**

[1] Tucows, Inc. does business under the name OpenSRS; however, there is no legal entity by the name of OpenSRS that is connected with Tucows. (Lazare Decl., P 3; Tucows' Br., at 6 n.6.) Therefore, this Court shall consider Tucows, Inc. and OpenSRS as a single entity.

[*2] Presently before the court are defendants' motions to dismiss the complaint pursuant to Fed. R. Civ. P. 12(b)(3), on the basis of improper venue, or, in the alternative, under Fed. R. Civ. P. 12(b)(6) and 12(b) (1), on the grounds that plaintiff fails to state a federal claim upon which relief may be granted and, absent

any federal question, this Court lacks jurisdiction due to an absence of complete diversity between the parties. Plaintiff cross-moves to strike certain of both defendants' declarations and exhibits, and defendant Tucows moves to strike certain of plaintiff's exhibits.

For the reasons that follow, plaintiff's motion to strike is granted in part and denied in part. Defendant Tucows' motion to strike is granted, and both defendants' motions to dismiss are granted on the basis of improper venue.

I. BACKGROUND

A. The Facts

The following facts are taken from the amended complaint.

In approximately November 1997, Novak registered for and obtained the Internet domain name "petswarehouse.com" through "Bulkregister.com," an internet domain name registration **[*3]** company. (Am. Compl. PP 36, 38.) He then commenced selling pet supplies and livestock via his website. (*Id.* P 124.) According to Novak, his website was the fourth most-visited pet-supply-related site in the United States during 1999. (*Id.* P 5.) On July 30, 2001, Novak trademarked the domain name "petswarehouse.com" and was awarded trademark number 2,600,670. (*Id.* P 36.)

On February 11, 2003, in the Circuit Court of Colbert County, Alabama, an individual named John Benn obtained a default judgment against Novak in the amount of $ 50,000. (*Id.* P 37.) Faced with the prospect of litigation in Alabama, Novak, a New York resident, opted to transfer the domain name "petswarehouse.com" from "Bulkregister.com," which was based in Maryland, to another company, Nitin, which was located in New York. (*Id.* PP 38-39.) On March 21, 2003, Novak contacted Nitin by telephone in order to initiate the transfer of his domain name. (*Id.* P 39.) A little over one month later, on May 1, 2003, Benn applied for a writ of execution to obtain Novak's domain name "petswarehouse.com" in an effort to enforce the default judgment that he had been awarded against Novak. (*Id.* P 41.) Novak **[*4]** asserts that it was only as a result of the May 1, 2003 writ of execution that he became aware that his domain name was actually being held by Tucows, a Canadian registration company, rather than the New York-based Nitin. (*Id.* P 42.) Novak contacted Nitin on May 2, 2003, and demanded that Nitin transfer registration of "petswarehouse.com" from Tucows back to Nitin. (*Id.*) Novak was told by Nitin that such a transfer was not possible. (*Id.*)

The Alabama trial court's May 1, 2003 writ of execution required Tucows to suspend domain name hosting of "petswarehouse.com" and to turn over the domain name to the Colbert County Sheriff's Department for public auction. (*Id.* P 45; Ex. C.) On May 23, 2003, Tucows transferred control over the domain name to the Alabama court pursuant to the court's order, and access to Novak's servers through the "petswarehouse.com" web address was suspended. (*Id.* P 47, 124; Ex. D.) Internet users accessing "petswarehouse.com" were directed to a web page providing notice of the Colbert County Sheriff's Sale of the domain name pursuant to the Alabama trial court's writ of execution. (*Id.* P 68; Ex. E.) On July 28, 2003, Benn purchased "petswarehouse. **[*5]** com" in a public auction held by the Colbert County Sheriff, in which Benn was the only bidder. (*Id.* P 54.) On September 16, 2003, Tucows transferred the domain name to Benn pursuant to the Alabama trial court's order. (*Id.* P 55.)

Novak challenged the Alabama trial court's decision, and on April 2, 2004, the Alabama Court of Civil Appeals reversed Benn's default judgment and writ of execution against Novak on the basis that the judgment had been entered without personal jurisdiction over Novak. (*Id.* P 71.) Armed with the state appellate court decision, Novak demanded that Tucows return control of "petswarehouse.com" to him. (*Id.* P 72.) On October 1, 2004, after Benn was denied rehearing by the Alabama Court of Civil Appeals and the Alabama Supreme Court, Tucows returned the domain name to Novak. (*Id.* P 72-73.)

Plaintiff alleges that the transfer of his domain name out of his control between May 1, 2003 and October 1, 2004 destroyed his pet-supply business. Prior to May 23, 2003, Novak had received approximately 12,000 daily visitors to "petswarehouse.com." (*Id.* P 134.) Following transfer of the domain name, visitors to the website were directed to the sheriff's **[*6]** notice of sale, and Novak was unable to process any pet-supply orders. (*Id.*) According to Novak, Tucows and Nitin's transfer of the domain name out of his control diluted the "petswarehouse.com" trademark in violation of the Lanham Act, 15 U.S.C. § 1125(c). Novak also asserts

that the transfer deceptively and misleadingly represented Tucows and Nitin's association with "petswarehouse.com," and constituted unfair competition and cyberpiracy under 15 U.S.C. §§ 1114, 1117 & 1125(a).

B. Procedural History

On April 25, 2006, Novak, proceeding *pro se,* filed the instant complaint against defendants Tucows, Inc. and OpenSRS. By letter dated May 11, 2006, defendant Tucows indicated its intention to move for dismissal on the basis of improper venue. Upon learning of defendants' proposed motion to dismiss, plaintiff modified his claims, adding Nitin as a defendant, and filed an amended complaint on May 16, 2006. On July 10, 2006, defendants Nitin and Tucows moved to dismiss the complaint on the basis of improper venue, or, in the alternative, failure to state a claim and lack of subject-matter **[*7]** jurisdiction. Plaintiff cross-moved to strike the declarations and exhibits submitted by defendants in support of their motions to dismiss, and defendants moved to strike certain of plaintiff's exhibits. Oral argument and an evidentiary hearing were held on December 22, 2006, January 25, 2007 and February 9, 2007.

II. EVIDENTIARY OBJECTIONS

A. Plaintiff's Motion to Strike

1. General Objections to Admissibility of Foreign Declarations

According to Novak, the declarations of two of defendant Tucows' employees in Canada are inadmissible under Fed. R. Evid. 902(12). Rule 902(12) permits foreign documents to be submitted into evidence as self-authenticating business records if accompanied by a declaration signed "in a manner that, if falsely made, would subject the maker to criminal penalty under the laws of the country where the declaration is signed." Fed. R. Evid. 902(12). Novak argues that, in order to meet this requirement, a "jurat including penalty of perjury" under Canadian law should have been provided by defendants with regard to the declarations submitted by Brenda Lazare ("Lazare"), Tucows' Secretary and **[*8]** General Counsel, and Evgeniy Pirogov ("Pirogov"), Team Leader of the OpenSRS Development Team. (Pl.'s Br., at 25-26.) However, where a matter must be supported by a sworn declaration, a declaration written outside of the United States may be supported "with like force and effect" by a statement in writing that "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America, that the foregoing is true and correct. Executed on (date)." 28 U.S.C. § 1746. In this instance, both the Lazare and Pirogov declarations contain the requisite statement, and are therefore admissible. (*See* Lazare Decl., at 9; Pirogov Decl., at 6.)

2. Objections to the Lazare Declaration

According to plaintiff, the Lazare declaration is also defective in failing to authenticate the attached Exhibits J-L as business records. The contested exhibits include: Exhibit J, excerpts from the registrar's agreement between Tucows and ICANN, the non-profit corporation that administers the internet domain name and internet protocol number system; Exhibit K, excerpts from Tucows' registrar license and the registry-registrar agreement between Tucows **[*9]** and Network Solutions, Inc. a/k/a Verisign, Inc. ("Verisign"), a registry that operates and maintains ".com" top-level domain names; and Exhibit L, excerpts from Nitin's reseller application and the reseller agreement between Tucows and Nitin. (Lazare Decl., Ex. J-L.) In the declaration, Lazare, as Secretary and General Counsel of Tucows, clearly sets forth her personal knowledge of the facts stated therein, explaining that she has held her current position overseeing management of the regulatory compliance and disputes department of Tucows since June 2000. (Lazare Decl., P 1-2.) Specifically, Lazare details Tucows' relationship with ICANN, Verisign and Nitin, and clearly sets forth how the related exhibits were created and maintained in the course of "regularly conducted business activity," pursuant to Fed. R. Evid. 803(6). Therefore, the Court finds that Exhibits J-L are properly authenticated by the Lazare declaration and, moreover, are admissible as business records.

Plaintiff further asserts that the Lazare Declaration should be held inadmissible on the basis that it contains legal argument. The Court finds that the first 26 paragraphs of the **[*10]** declaration contain factual descriptions of the domain name registration and transfer processes. (*Id.* PP 1-26.) However, paragraphs 27-31 of the declaration present legal argument regarding the applicability of the forum selection clause at issue in this case, and as such, those paragraphs shall be disregarded. (*Id.* PP 27-31.) *See, e.g., Kamen v. Am.*

*Tel. & Tel. Co.,* 791 F.2d 1006, 1011 (2d Cir. 1986) (holding that it was improper for district court to consider "conclusory and hearsay" statements in an attorney affidavit where the statements were not based upon personal knowledge).

3. Objections to the Pirogov Declaration

Novak argues that the Pirogov Declaration lacks personal knowledge, expresses "expert opinion" testimony, and includes hearsay. Pirogov, Team Leader of the OpenSRS Development Team since October 2003, asserts in his declaration that his duties include "supervision of the software development that allows Tucows to process transfers, and maintenance of the logs that archive prior transfers." (Pirogov Decl., PP 1-4.) Based upon Pirogov's position and his statements, the Court finds that he has sufficient personal knowledge to describe Tucows' **[*11]** domain name transfer process, and to authenticate the exhibits demonstrating that process. Furthermore, the Court finds no basis in the declaration for Novak's assertion that it includes "expert opinion" testimony or hearsay.

In addition, plaintiff objects to the admissibility of Exhibits B-I, authenticated therein, on the basis that they have been newly created for purposes of this litigation, and were not kept in the ordinary course of business. The Court disagrees. First, the Court finds that these exhibits have been authenticated by Pirogov pursuant to Rule 901(b)(9), which permits the admission of "[e]vidence describing a process or system used to produce a result and showing that the process or system produces an accurate result." Fed. R. Evid. 901(b)(9). Furthermore, to the extent that Exhibits B-I are submitted merely as a demonstrative aid, the Court finds that the hearsay rule is not applicable. "[T]here is no requirement that demonstrative evidence be shown to be totally accurate. Rather, alleged inaccuracies go to the weight and not the admissibility of the evidence." 5-900 *Weinstein's Federal Evidence* § 900.07 **[*12]** (2006); *see, e.g., Datskow v. Teledyne Cont'l Motors Aircraft Prod.,* 826 F. Supp. 677, 686 (W.D.N.Y. 1993) (admitting computer-generated animation used to show theory of how accident occurred). Thus, the Court shall consider Exhibits B-I to the extent that they demonstrate the process of transferring domain names, rather than to show the transfer steps specific to "petswarehouse.com." [2]

## FOOTNOTES

[2] At the evidentiary hearing, Eliot Noss, CEO of Tucows, testified regarding a series of additional exhibits that recreate the steps taken during Novak's transfer of the domain name "petswarehouse.com" based upon information stored in Tucows' databases. This Court ruled that such exhibits were, in fact, admissible for purposes of showing the transfer steps specific to the transaction in question:

> There are a few documents in which the witness testified the computer took data and put it in the form of how it would have appeared on the page at the time to show where the information would have been inputted on the forms as they currently existed at the time of the transaction. I find that that is also admissible. . . . [T]he witness properly laid the foundation for the[m] having retained the data, and for what forms they used at the time, and it was clear to point out that this was not created at the time, but it was recreated to show, based upon what data they stored, where it would have been inputted on their existing forms. So I think it is admissible under the rules of evidence. . . . I think, based upon [Noss'] testimony, they have laid the proper foundation for the admissibility of the documents. So I am admitting Defense Exhibits T1 through 10.

(Transcript of December 22, 2006 Hearing (hereinafter "Dec. 22, 2006 Tr.," at 125-26.)

**[*13]** 4. Objections to the Agarwal Declaration

Novak argues that the declaration submitted by Nitin Agarwal ("Agarwal"), CEO and founder of Nitin, contains impermissible hearsay and is not based on personal knowledge. The Court finds, based upon Agarwal's position, that he had personal knowledge of the events relating to Nitin's handling of the transfer of Novak's domain name. Moreover, any potential defects in Agarwal's declaration were subsequently cured by his testimony at the evidentiary hearing, in which he set forth a clear basis for his personal knowledge of

Novak's interactions with Nitin in transferring "petswarehouse.com."

Plaintiff also asserts that the Agarwal Declaration contains the false statement that "[a]t the time of the transfer [March 21, 2003], Nitin Networks was not registering any domain names as a registrar, and was exclusively using Defendant Tucows for all of its registrations and transfers." [3] (Agarwal Decl., P 4.) According to plaintiff, this statement conflicts with evidence that Nitin Networks was, in fact, registering domain names. However, plaintiff's objection does not go to the admissibility of the Agarwal Declaration, but to its credibility and [*14] weight.

### FOOTNOTES

[3] During the evidentiary hearing, plaintiff cross-examined Agarwal regarding paragraph 4 of his declaration, and Agarwal affirmed "I stand by the full sentence of the statement." (Jan. 25, 2007 Tr. 87.)


### B. Defendants' Motion to Strike

Defendants contend that plaintiff's Exhibits B, J, K, O-R, U and V, which are printouts of internet pages, constitute inadmissible hearsay and do not fall within any acknowledged exception to the hearsay rule. [4] At the evidentiary hearing, defendants objected to Plaintiff's Exhibit 1, as well as to Plaintiff's Exhibits N-R. (Jan. 25, 2007 Tr. 125-31.) Plaintiff's Exhibit 1 is a printout from "RegisterSite.com," Nitin's website, as it purportedly appeared in 2003. (Pl.'s Ex. 1.) According to plaintiff, he obtained the printout through a website called the Internet Archive, which provides access to a digital library of Internet sites. (Novak Decl., P 2.) The Internet Archive operates a service called the "Wayback Machine," which purports to allow a user to obtain an archived [*15] web page as it appeared at a particular moment in time. (See id. PP 3-5.) The other contested exhibits include: Exhibit B, an online summary of plaintiff's past and pending lawsuits, obtained via the Wayback Machine; Exhibit J, printouts of comments on a web message board by Pirogov; Exhibit K, a news article from the Poughkeepsie Journal website featuring Agarwal; Exhibit N, Novak's declaration regarding the authenticity of pages printed from the Wayback Machine; Exhibit O, pages printed from the Internet Archive website; Exhibit P, pages printed from the Wayback Machine website; Exhibits Q, R and U, all of which constitute pages printed from RegisterSite.com via the Wayback Machine; and Exhibit V, a news article from "The Register," a British website, regarding Tucows. (Pl.'s Exs. B, J, K, N-R, U & V.) Where postings from internet websites are not statements made by declarants testifying at trial and are offered to prove the truth of the matter asserted, such postings generally constitute hearsay under Fed. R. Evid. 801. *United States v. Jackson,* 208 F.3d 633, 638 (7th Cir. 2000) (declining to admit web postings where defendant [*16] was unable to show that the postings were authentic, and holding that even if such documents qualified under a hearsay exception, they are "inadmissible if the source of information or the method or circumstances of preparation indicate a lack of trustworthiness") (quoting *United States v. Croft,* 750 F.2d 1354, 1367 (7th Cir. 1984)); see also *St. Clair v. Johnny's Oyster & Shrimp, Inc.,* 76 F. Supp. 2d 773, 775 (S.D. Tex. 1999) ("[A]ny evidence procured off the Internet is adequate for almost nothing, even under the most liberal interpretation of the hearsay exception rules.").


### FOOTNOTES

[4] During the evidentiary hearing, defendant Tucows also objected to the admission of plaintiff's Exhibit S, a document titled "OpenSRS Quickstart Instructions," and dated January 2001, on the basis that the exhibit had not been authenticated by Tucows. (Jan. 25, 2007 Tr. 46-50.) By letter dated January 30, 2007, Tucows withdrew its objection based upon the authenticity of Exhibit S. (Tucows' January 30, 2007 Letter, at 2.) However, Tucows "reserve[d] the right to argue the immateriality of the document, based both on its contents and the relevance of the 2001 document to events that took place in 2003." (*Id.*)


[*17] Furthermore, in this case, such documents have not been properly authenticated pursuant to Fed. R. Evid. 901. While plaintiff's declaration purports to cure his inability to authenticate the documents printed from the internet, he in fact lacks the personal knowledge required to set forth with any certainty that the documents obtained via third-party websites are, in fact, what he proclaims them to be. This problem is even more acute in the case of documents procured through the Wayback Machine. Plaintiff states that the web

pages archived within the Wayback Machine are based upon "data from third parties who compile the data by using software programs known as crawlers," who then "donate" such data to the Internet Archive, which "preserves and provides access to it." (Novak Decl. P 4.) Based upon Novak's assertions, it is clear that the information posted on the Wayback Machine is only as valid as the third-party donating the page decides to make it -- the authorized owners and managers of the archived websites play no role in ensuring that the material posted in the Wayback Machine accurately represents what was posted on their official websites **[*18]** at the relevant time. As Novak proffers neither testimony nor sworn statements attesting to the authenticity of the contested web page exhibits by any employee of the companies hosting the sites from which plaintiff printed the pages, such exhibits cannot be authenticated as required under the Rules of Evidence. *See, e.g. Costa v. Keppel Singmarine Dockyard PTE, Ltd.,* No. 01-CV-11015 MMM (Ex), 2003 U.S. Dist. LEXIS 16295, at *29 n.74 (C.D. Cal. Apr. 25, 2003) (declining to consider evidence downloaded from corporation's website in the absence of testimony from the corporation authenticating such documents) (citing *Jackson,* 208 F.3d at 638, and *St. Clair,* 76 F. Supp. 2d at 775 ("Anyone can put anything on the internet. No web-site is monitored for accuracy and nothing contained therein is under oath or even subject to independent verification absent underlying documentation.")). Therefore, in the absence of any authentication of plaintiff's internet printouts, combined with the lack of any assertion that such printouts fall under a viable exception to the hearsay rule, defendants' motion to strike Exhibits B, J, K, N-R, U and V is granted. **[*19]** ⁵

## FOOTNOTES

⁵ The Court notes that, even if all of plaintiff's exhibits were admissible, they would not impact the Court's analysis or conclusions on the substantive issues in the instant case.

## III. STANDARD OF REVIEW

Defendants challenge venue in this case pursuant to Federal Rule of Civil Procedure 12(b)(3). However, the Court must first address the question of whether a motion to dismiss based upon a forum selection clause is properly brought under Rule 12(b)(3) as a challenge to venue, rather than under Rule 12(b)(6) for failure to state a claim or Rule 12(b)(1) for lack of subject-matter jurisdiction.

In *New Moon Shipping Co., Ltd. v. Man B&W Diesel A.G.,* the Second Circuit acknowledged the absence of consensus among the courts regarding the correct procedural mechanism for dismissal of a suit pursuant to a valid forum selection clause. 121 F.3d 24, 28 (2d Cir. 1997) (comparing *AVC Nederland B.V. v. Atrium Inv. P'ship,* 740 F.2d 148, 152 (2d Cir. 1984) **[*20]** (applying Fed. R. Civ. P. 12(b)(1) to a motion to dismiss based upon a forum selection clause), with *Paterson, Zochonis (U.K.) Ltd. v. Compania United Arrows, S.A.,* 493 F. Supp. 626, 629 (S.D.N.Y. 1980) (applying Fed. R. Civ. P. 12(b)(3))); *see also Rainforest Cafe, Inc. v. EklecCo, L.L.C.,* 340 F.3d 544, 546 n.5 (8th Cir. 2003) (recognizing controversy between whether to apply Fed. R. Civ. P. 12(b)(3) or Fed. R. Civ. P. 12(b)(6) to a motion to dismiss based on forum selection clause). In this instance, defendants have framed the forum-selection clause issue as a motion to dismiss pursuant to Rule 12(b)(3), and in the absence of any objection to this framework by plaintiff, the Court shall consider the jurisdictional issue pursuant to this rule. *See, e.g., Person v. Google, Inc.,* 456 F. Supp. 2d 488, 492-93 (S.D.N.Y. 2006) ("Here, the issue will be considered under Fed. Civ. P. Rule 12(b)(3) because that is how it was framed by the parties. **[*21]** ") (citing *J. B. Harris, Inc. v. Razei Bar Indus., Inc.,* 37 F. Supp. 2d 186, 189 (E.D.N.Y. 1998) ("The Court does not decide whether this issue might more properly have been raised by way of Rule 12(b)(6), as the issue is squarely framed by Defendants under Rule 12(b)(3) and Plaintiff does not argue that this is an improper procedural mechanism.") (internal citation omitted)).

Without resolving the question of whether to treat the motion to dismiss as a 12(b)(1) or 12(b)(3) motion, the Second Circuit held in *New Moon Shipping* that "at the initial stage of litigation, a party seeking to establish jurisdiction need only make a *prima facie* showing by alleging facts which, if true, would support the court's exercise of jurisdiction." 121 F.3d at 29 (citing *Marine Midland Bank, N.A. v. Miller,* 664 F.2d 899, 904 (2d Cir. 1981)); *Gulf Ins. Co. v. Glasbrenner,* 417 F.3d 353, 355 (2d Cir. 2005) ("If the court chooses to rely on pleadings and affidavits, the plaintiff need only make a *prima facie* showing of [venue].") (quoting *CutCo Indus. v. Naughton,* 806 F.2d 361, 364-65 (2d Cir. 1986) and citing **[*22]** *Sunward Elecs. v. McDonald,* 362 F.3d 17, 22 (2d Cir. 2004)). "After limited discovery on the jurisdictional issue, the matter might be appropriate for resolution on motion supported by affidavits, or, if a genuine dispute of material

Get a Document - by Citation - 2003 U.S. Dist. LEXIS 10788 (Callaghan)   Filed 02/15/2008   Page 22 of 30   Page 7 of 15

Case 7:07-cv-03659-LMS   Document 12-12

fact exists, the Court may conduct a hearing limited to Article III standing." *Alliance for Envtl. Renewal, Inc. v. Pyramid Crossgates Co.*, 436 F.3d 82, 87-88 (2d Cir. 2006) (citations omitted). Disputed facts may be resolved against the non-moving party only after an evidentiary hearing, where the plaintiff must demonstrate venue by a preponderance of the evidence. *New Moon Shipping*, 121 F.3d at 29 ("A disputed fact may be resolved in a manner adverse to the plaintiff only after an evidentiary hearing. . . . [A] party seeking to avoid enforcement of such a contractual clause is also entitled to have the facts viewed in the light most favorable to it, and no disputed fact should be resolved against that party until it has had an opportunity to be heard.") (citations omitted); *Gulf Ins. Co.*, 417 F.3d at 355 ("[I]f the court holds an evidentiary hearing . . . the plaintiff must demonstrate **[*23]** [venue] by a preponderance of the evidence.") (quoting *CutCo Indus.*, 806 F.2d at 364-65) (additional citation omitted); *Murphy v. Schneider Nat'l, Inc.*, 362 F.3d 1133, 1139 (9th Cir. 2004) ("To resolve such motions when genuine factual issues are raised, it may be appropriate for the district court to hold a Rule 12(b)(3) motion in abeyance until the district court holds an evidentiary hearing on the disputed facts. Whether to hold a hearing on disputed facts and the scope and method of the hearing is within the sound discretion of the district court.") (citations omitted).

In this case, the Court conducted an evidentiary hearing to resolve a disputed material fact as to whether venue is proper in this Court: specifically, whether plaintiff consented to an agreement with defendant Tucows that contained a forum selection clause mandating litigation of all related disputes in Ontario, Canada. At the evidentiary hearing, all parties presented evidence bearing on the question of whether Novak agreed to transfer his domain name to Tucows by clicking his assent to a Domain Name Transfer Agreement ("DNTA") on a website. The DNTA in question contained the **[*24]** following forum selection clause at paragraph 27:

> GOVERNING LAW. This agreement shall be governed by and interpreted and enforced in accordance with the laws of [sic] Province of Ontario and the federal laws of Canada applicable therein without reference to rules governing choice of laws. *Any action relating to this agreement must be brought in Ontario* and you irrevocably consent to the jurisdiction of such courts.

(Pirogov Decl., Ex. H.) The legal effect of a forum selection clause depends upon "whether its existence was reasonably communicated to the plaintiff." *Effron v. Sun Line Cruises, Inc.*, 67 F.3d 7, 9 (2d Cir. 1995) (citations omitted). "A forum selection clause stated in clear and unambiguous language . . . is considered reasonably communicated to the plaintiff in determining its enforceability." *Vitricon, Inc. v. Midwest Elastomers, Inc.*, 148 F. Supp. 2d 245, 247 (E.D.N.Y. 2001) (citing *Effron*, 67 F.3d at 9). As there is no question that the language of the forum-selection clause at issue is clear and unambiguous, should this Court find that Novak did, in fact, "click-through" the Tucows DNTA, the Court **[*25]** may fairly conclude that the clause was "reasonably communicated" to the plaintiff. *Id.*

IV. THE EVIDENTIARY HEARING

The Court conducted an evidentiary hearing, over several days, to determine whether Novak in fact "clicked-through" his assent to Tucows' DNTA. Based upon the testimony and exhibits presented at the hearing, the Court finds that there is overwhelming evidence that the plaintiff consented to the DNTA with Tucows. Although it is unclear whether plaintiff actually read the agreement, the evidence unequivocally demonstrates that he was required to "click-through" his assent to Tucows' DNTA in order to complete the successful transfer of "petswarehouse.com."

The plaintiff argues that he never agreed to the forum-selection clause, and, further, that he never agreed to enter into any agreement whatsoever with defendant Tucows. According to Novak, when he transferred the domain name "petswarehouse.com" from its original registrar, "Bulkregister.com," he did so solely by phone agreement with Nitin, whose online transfer system was not operational at the time. (Jan. 25, 2007 Tr. 117.) Novak explained that he was not aware that Nitin was actually a reseller, rather than a **[*26]** registrar, of domain names, nor that Tucows was the actual registrar of "petswarehouse.com" until over a month after the transfer, when Benn issued a writ of execution to obtain the domain name from Tucows. (Jan. 25, 2007 Tr. 112, 117; Feb. 9, 2007 Tr. 49.) Novak argues that, in fact, his intent in transferring the domain name from "Bulkregister.com" to Nitin was to bring the domain name under the control of a New York-based registrar. (Jan. 25, 2007 Tr. 110-11; Feb. 9, 2007 Tr. 66-67.) According to Novak, had he received a DNTA from Tucows, a Canadian registrar, he "would have declined the transfer, first because [he] would have felt

deceived in seeing another company being involved in this transaction, and moreover a company based not only outside New York, but Canada." (Feb. 9, 2007 Tr. 63.)

In response, defendants argue that plaintiff could not possibly have executed transfer of his domain name to Tucows solely by oral agreement by phone with Nitin. According to Tucows, "[p]laintiff's assertion that he transferred the petswarehouse.com domain name orally through Nitin Networks is demonstrably and necessarily false, as the domain name registration system does not permit transfers **[*27]** without the safeguard of an electronic confirmation." (Tucows' Br., at 5.) Contrary to Novak's assertion that he never entered into any agreement with Tucows, Noss testified that such agreements are "necessary" to the domain name transfer process, and that "[t]hey are overwhelmingly -- in fact, in our case, almost without exception, they are click-through agreements, ones that are subscribed to on a web page." (Dec. 22, 2007 Tr. 14.) Tucows asserts that, after plaintiff communicated with Nitin by phone, he received notification by email from Tucows that he would have to execute further electronic authorization of the transfer. (Tucows' Br., at 5.) According to Tucows, in the confirmation email, plaintiff was instructed to click on a link directing him to Tucows' website, where he was required to submit a "Transfer Confirmation Form," affirming that he had "both read and understood the Domain Transfer and Registration Contract," and that he "fully accepts the terms of the Domain Name Transfer and Registration Contract." [6] (Tucows' Br., at 4.) A hyperlink to the DNTA was provided on the Transfer Confirmation Form. (Tucows' Br., at 4.) However, Novak categorically asserts that he "never **[*28]** received the e-mail. If I would have, I would have immediately canceled and gone to another registrar in New York." (Feb. 9, 2007 Tr. 66.)

**FOOTNOTES**

6 In addition, Tucows argues that it was clear from the electronic confirmation form that plaintiff would be entering into a contract with Tucows (rather than with Nitin) by language on the form stating that "[t]he domain listed above will be transferred to Registersite.com (An authorized reseller of Tucows)." (Tucows' Br., at 4.)

During the evidentiary hearing, Noss, Tucows' CEO, testified, based upon a review of Tucows' records, that the plaintiff had, in fact, engaged in each of the above steps:

> I can say with certainty that, first, the request for transfer was received by Tucows, that we sent a confirmatory e-mail to bob@petswarehouse.com. We have the IP address, in other words, the specific address of the computer that was connected to the internet that received that e-mail. I can say with certainty that that e-mail, coming from IP address, had a link in it **[*29]** which was clicked on. And that e-mail contained a unique password generated solely for the purpose of confirming this transfer. That password was then entered into the web page that resulted from clicking on the link. And I can also say with certainty that on the resulting pages, that the box that says, in effect, I agree with the terms and conditions, was ticked.

(Dec. 22, 2006 Tr. 21-22.) Noss' testimony is fully corroborated by exhibits introduced at the hearing, which are printouts from Tucows' computer database that reflect data generated contemporaneously with Novak's domain name transfer. On March 31, 2003, at 12:28 p.m. and 43 seconds Eastern Standard Time, Tucows received a transfer request. (Dec. 22, 2006 Tr. 30; Defs.' Ex. T2.) Three seconds later, Tucows sent a confirmation email to "bob@petswarehouse.com," Novak's email address. [7] (Dec. 22, 2006 Tr. 30; Defs.' Ex. T2.) On the same day, at 5:07 p.m. and 26 seconds, a hyperlink within the email was clicked by the recipient. (Dec. 22, 2006 Tr. at 58-59; Defs.' Ex. T6.) Less than one minute later, at 5:08 p.m. and 15 seconds, the email recipient typed the required domain name and transfer key into the Tucows website. **[*30]** (Dec. 22, 2006 Tr. at 59; Defs.' Ex. T6.) Finally, at 5:14 pm and 51 seconds, the contract on the website was assented to and the request was submitted. (Dec. 22, 2006 Tr. at 59; Defs.' Ex. T6.) Noss explained that, if Novak had not entered the proper information during each of these steps, or if he had simply ignored the confirmation email from Tucows, the transfer would have failed. (Dec. 22, 2006 Tr. at 60.)

**FOOTNOTES**

7 Novak concedes that he is the sole user of the email address "bob@petswarehouse.com," and that the address is not case-sensitive." (Feb. 9, 2007 Tr. 27, 28.)

In response, Novak counters that he never engaged in the required steps, and that it was actually Agarwal, CEO of Nitin, who "went directly into the Tucows database, changed the contact info to himself, received the confirmation e-mails, and clicked them off to force the transfer to go through. Alternatively, he modified the database to indicate that that had occurred." (Feb. 9, 2007 Tr. 66.) However, the Court finds Novak's theory that Agarwal [*31] manually input false data in order to effect the domain name transfer to be incredible. Based upon the overwhelming evidence that Novak did, in fact, assent to the DNTA, and that a transfer of his domain name to Tucows would not have been possible without such assent, the Court finds, despite Novak's blanket denials and conspiracy theories, that he did enter into such an agreement with Tucows and therefore is subject to the forum-selection clause contained therein, unless there is some ground for the clause to be found invalid. It is the latter issue to which the Court now turns.

V. VALIDITY OF FORUM SELECTION CLAUSE

A. Standard

Under the standard set forth by the Supreme Court in *The Bremen v. Zapata Off-Shore Company,* forum selection clauses are *prima-facie* valid and should control questions of venue absent a "strong showing" that enforcement would be "unreasonable and unjust, or that the clause was invalid for such reasons as fraud or overreaching." 407 U.S. 1, 15, 16, 92 S. Ct. 1907, 32 L. Ed. 2d 513 (1972). A forum selection clause can bind the parties even where the agreement in question is a form consumer contract that is not subject to negotiation. *Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 589-95, 111 S. Ct. 1522, 113 L. Ed. 2d 622 (1991). [*32] Such clauses will be enforced only if found to be exclusive or mandatory. *John Boutari and Son, Wines and Spirits, S.A., v. Attiki Imp. and Distrib., Inc.,* 22 F.3d 51, 52-53 (2d Cir. 1994). It is clear that the choice of forum is mandatory in this instance, as specific language regarding venue has been included in the clause, specifying that "any action relating to this agreement must be brought in Ontario." *See, e.g., John Boutari and Son, Wines and Spirits, S.A.,* 22 F.3d at 53; *Docksider, Ltd. v. Sea Tech., Ltd.,* 875 F.2d 762, 763-64 (9th Cir. 1989); *Cent. Nat'l-Gottesman, Inc. v. M.V. "Gertrude Oldendorff,"* 204 F. Supp. 2d 675, 678 (S.D.N.Y. 2002) ("For a forum selection clause to be deemed mandatory, jurisdiction and venue must be specified with mandatory or exclusive language.") (citation omitted).

As the forum selection clause at issue is mandatory, it is enforceable, provided that enforcement would not be unreasonable. A clause is unreasonable: (1) if their incorporation into the agreement was the result of fraud or overreaching; (2) if the complaining party will be deprived of his day in court due to the grave [*33] inconvenience or unfairness of the selected forum; (3) if the fundamental unfairness of the chosen law may deprive the plaintiff of a remedy; or (4) if the clauses contravene a strong public policy of the forum state. *Roby v. Corp. of Lloyd's,* 996 F.2d 1353, 1363 (2d Cir. 1993) (citing *M/S Bremen v. Zapata Off-Shore Co.,* 407 U.S. 1, 10, 15, 18, 92 S. Ct. 1907, 32 L. Ed. 2d 513 (1972), and *Carnival Cruise Lines, Inc.,* 499 U.S. at 595-96); *S.K.I. Beer Corp. v. Baltika Brewery,* 443 F. Supp. 2d 313, 316 (E.D.N.Y. 2006) (same) (citations omitted). In his moving papers, plaintiff alleges neither that he will be deprived of his day in court due to the inconvenience of litigating this dispute in Ontario, 8 nor that Canadian law is fundamentally unfair and would deprive him of a remedy. 9

**FOOTNOTES**

8 In his supplemental reply brief, dated February 21, 2007, Novak asserts for the first time that he is not able to litigate this dispute in Canada for health reasons. In support of this claim, Novak submits a letter from his treating neurologist, Dr. Candice Perkins, M.D., stating that Novak sustained a carotid occulsion and stroke in August 2000 and continues to suffer from a persistent blockage of blood flow to his brain. (Pl.'s Supp. Br., Ex. A.) According to Dr. Perkins, "as a result prolonged travel out of the country (without close contact of [Novak's] medical team) is ill advised." (*Id.*) In fact, while Novak may very well suffer from illnesses that restrict his ability to travel, such impairments did not prevent him from driving cross-country over a two-week span from January 1 to 14, 2007. (Dec. 22, 2006 Tr. 127.) Novak has given no indication that engaging in litigation in Toronto would be more taxing on his health than his recent travel across the United States; therefore, the Court rejects his argument that "[b]ased on [Dr. Perkins'] opinion

and my families [sic] concerns I would have to abandon the thought of any cause of action in Canada against Tucows." (Pl.'s Supp. Br., at 2.) Even if Novak were unable to personally attend proceedings in Canada, such deprivation does not necessarily constitute a denial of his day in court. This Circuit has held that "[t]he right to a day in court means not the actual presentation of the case, but the right to be duly cited to appear and to be afforded an opportunity to be heard." *Effron*, 67 F.3d at 11 (quoting *Olsen v. Muskegon Piston Ring Co.*, 117 F.2d 163, 165 (6th Cir. 1941)). "A plaintiff may have his 'day in court' without ever setting foot in a courtroom." *Id.* (citation omitted). While Novak may prefer to bring his case against Tucows in a familiar forum, he consented to bring any such claims in Ontario; in the absence of any showing that plaintiff's health concerns will actually deprive him of his day in court, this Court declines to find that plaintiff should be permitted to evade his contractual obligations. **[*34]**

9 In his supplemental brief, Novak also raises for the first time the argument that he could be deprived of a remedy under Canadian law because he "doubt[s] very much that court would have jurisdiction over Nitin but more importantly Canada would have no jurisdiction over John Benn as a witness residing in Alabama" and "there is an issue of the statute of limitation in recommencing this action in Canada." (Pl.'s Supp. Br., at 2, 3.)

First, a "statute of limitations bar is not a basis for invalidating [a foreign] forum selection clause." *Asoma Corp. v. M/V. Southgate*, 98-CV-7407 (CSH), 1999 U.S. Dist. LEXIS 18974, at *9-*12 (S.D.N.Y. Dec. 7, 1999) (collecting cases); *see also Street, Sound Around Elec., Inc. v. M/V Royal Container*, 30 F. Supp. 2d 661, 663 (S.D.N.Y. 1999) ("By bringing suit here and not in Germany, plaintiffs have effectively chosen to ignore the forum selection clause that they previously agreed to; plaintiffs will not be heard now to complain of any potential timeliness problems that this choice may have created.") (citations omitted); *see also New Moon Shipping*, 121 F.3d at 33 ("[C]onsideration of a statute of limitations would create a large loophole for the party seeking to avoid enforcement of the forum selection clause. That party could simply postpone its cause of action until the statute of limitations has run in the chosen forum and then file its action in a more convenient forum.").

Second, while it is unclear whether Agarwal and Benn could be compelled to appear before a court in Ontario, the Court is not persuaded that this factor suggests the "fundamental unfairness" of litigating the instant dispute in Canada. At least in the context of transfers of lawsuits pursuant to 28 U.S.C. § 1404(a), courts have held that the availability of witnesses does not "tip the balance" with regard to the choice of a forum, particularly where the testimony of such witnesses may be obtained by videotape or deposition. *Dealtime.com Ltd. v. McNulty*, 123 F. Supp. 2d 750, 757 (S.D.N.Y. 2000); (citing Fed. R. Evid. 804(a)(5) and *Citigroup Inc. v. City Holding Co.*, 97 F. Supp. 2d 549, 561-62 (S.D.N.Y. 2000) ("[T]he unavailability of process over third-party witnesses does not compel transfer when the practical alternative of offering videotaped or deposition testimony of a given witness exists.") (citations omitted). There is no reason to believe that such alternatives to live testimony are not available to Novak in this case.

**[*35]**  Plaintiff's contends: (1) that the "petswarehouse.com" domain name was fraudulently transferred from Nitin to Tucows without his permission, and that holding him to the DNTA would therefore be unconscionable under New York state law because he did not consent to the contract terms, and (2) that the forum selection clause contravenes the public policy of New York state, which protects resident consumers against deceptive business acts and practices under New York General Business Law § 349.

B. FRAUD

Plaintiff alleges, first, that Nitin misled him by falsely representing that Novak would only be interacting with a New York company when he transferred his domain name to Nitin. Plaintiff claims that Nitin concealed the fact that he was merely a reseller of domain names, and that Tucows, a Canadian company, would be the actual registrar. In other words, according to plaintiff, he was lured into transacting with Nitin on the basis of false information and misrepresentation. Plaintiff also alleges that his domain name was fraudulently transferred without his permission from Nitin, with whom he contracted by phone, to Tucows, with whom he did not contract at all. **[*36]** However, even if plaintiff were able to establish valid fraud claims based on these assertions, which he likely cannot, given his "click-through" assent to the Tucows DNTA, such allegations are insufficient to void a forum selection clause on the basis of fraud.

Actions capable of overcoming the presumption of validity of a forum selection clause "must be *directly related to that clause,* not the contract more generally." *Person,* 456 F. Supp. 2d at 494 (citations omitted). The Supreme Court has held that, where a party attempting to defeat a forum-selection clause alleges fraud, courts must look to whether the inclusion of the clause itself was fraudulent:

> In *The Bremen* we noted that forum-selection clauses "should be given full effect" when "a freely negotiated private international agreement [is] unaffected by fraud . . ." This qualification does not mean that any time a dispute arising out of a transaction is based upon an allegation of fraud, as in this case, the clause is unenforceable. Rather, it means that an arbitration or forum-selection clause in a contract is not enforceable if *the inclusion of that clause in the contract* was the product **[*37]** of fraud or coercion.

*Scherk v. Alberto-Culver Co.,* 417 U.S. 506, 519 n.14, 94 S. Ct. 2449, 41 L. Ed. 2d 270 (1974) (internal citation omitted) (emphasis in original). In this case, Novak fails to allege any fraud specifically relating to the forum-selection clause in question. Further, there is no indication that the clause was added to the DNTA in bad faith, or by coercion. Plaintiff therefore has not established grounds for rejecting the clause on the basis of fraud.

## C. UNCONSCIONABILITY

Plaintiff also argues that the DNTA is unconscionable under New York law because he was never provided with an opportunity to view the contract or to consent to its terms. According to plaintiff, he was denied any "meaningful choice" with regard to the selection of Tucows as a registrar, thus demonstrating the contract's unconscionability. (Pl.'s Br., at 40.) However, plaintiff does not actually identify any particular terms of the contract that are substantively unconscionable; instead, he merely reiterates his assertion that he was never given an opportunity to read the contract, a factor that speaks to the agreement's *procedural* unconscionability.

"Procedural unconscionability involves 'the lack **[*38]** of meaningful choice,' which considers all the circumstances surrounding the contract, including whether each party had a reasonable opportunity to understand the terms of the contract, whether deceptive tactics were employed, the use of fine print, and disparities in education, experience and bargaining power." *Gill v. World Inspection Network Int'l, Inc.,* No. 06-CV-3187 (JFB) (CLO), 2006 U.S. Dist. LEXIS 52426, at *19 (E.D.N.Y. Jul. 31, 2006) (citing *Nelson v. McGoldrick,* 127 Wn.2d 124, 896 P.2d 1258, 1262 (Wash. 1995), and *Gillman v. Chase Manhattan Bank, N.A.,* 73 N.Y.2d 1, 534 N.E.2d 824, 828, 537 N.Y.S.2d 787 (N.Y. 1988)). While plaintiff maintains that he neither read nor assented to any agreement with Tucows, this Court has found that plaintiff did, in fact, "click-through" his assent to the DNTA. As a result, even if plaintiff failed to read the terms of the contract, he is nevertheless bound by the forum-selection clause. "[I]t is a fundamental principle of contract law that a person who signs a contract is presumed to know its terms and consents to be bound by them." *Paper Express, Ltd. v. Pfankuch Maschinen GMBH,* 972 F.2d 753, 757 (7th Cir. 1992) **[*39]** (enforcing forum-selection clause where plaintiff had not read the clause prior to signing the contract) (citing 3 Arthur L. Corbin, *Corbin on Contracts* 607 (1989), and 13 Samuel Williston, *Williston on Contracts* 1577 (1988)); *see also Ainsley Skin Care of N.Y., Inc. v. Elizabeth Grady Face First, Inc.,* No. 97-CV-6716 (LAP) (AJP), 1997 U.S. Dist. LEXIS 19102, at *11 (S.D.N.Y. Dec. 2, 1997) ("[A] businessman acting in a commercial context, is held to have understood the consequences of his having signed [contracts], which designate [a particular forum] as the appropriate forum for any action arising thereunder. If [the complaining party] did not read them or hire counsel to do so, he is the victim of his own lack of diligence, not [the opposing party's] misconduct.") (quoting *Elite Parfums, Ltd. v. Rivera,* 872 F. Supp. 1269, 1273 (S.D.N.Y. 1995) (internal citation and additional citations omitted)); *Weingrad v. Telepathy, Inc.,* No. 05-CV-2024 (MBM), 2005 U.S. Dist. LEXIS 26952, at *11 (S.D.N.Y. Nov. 7, 2005) ("He is bound by the terms of the forum selection clause even if he did not take the time to read it because **[*40]** 'a signatory to a contract is presumed to have read, understood and agreed to be bound by all terms, including the forum selection clauses, in the documents he or she signed.'") (quoting *Sun Forest Corp. v. Shvili,* 152 F. Supp. 2d 367, 382 (S.D.N.Y. 2001) (internal citation omitted)).

In addition, although the DNTA is a standard form contract offered to all of Tucows' domain name transfer customers, the forum-selection clause may not be defeated for procedural unconscionability on this basis. The Supreme Court has recognized that where a company conducts business in several states, as in the case

of Tucows, a non-negotiated forum-selection clause may be enforced even where it was not the subject of bargaining. [10] *Carnival Cruise Lines, Inc.,* 499 U.S. at 593-595; *Rosenfeld v. Port Auth. of N.Y. and N.J.,* 108 F. Supp. 2d 156, 164 (E.D.N.Y. 2000) (noting that an agreement "cannot be considered procedurally unconscionable, or a contract of adhesion, simply because it is a form contract").

## FOOTNOTES

[10] Novak contends that Tucows should be subject to jurisdiction before this Court because in an unrelated case, *Bennett v. America Online, Inc.,* No. 06-CV-13221, 471 F. Supp. 2d 814, 2007 U.S. Dist. LEXIS 25887, 2007 WL 241318 (E.D. Mich. Jan. 23, 2007), "Tucows had acquiesed to the jurisdiction of the United States Courts not with standing their forum selection clause." (Pl.'s Supp. Br., at 2.) In *Bennett,* which involved a copyright dispute against defendants America Online, Inc. ("AOL") and Tucows, the Eastern District of Michigan considered whether to transfer the plaintiff's case to Virginia pursuant to 28 U.S.C. § 1404(a), based upon AOL's forum-selection clause. *Bennett,* 2007 U.S. Dist. LEXIS 25887, 2007 WL 241318, at *1. While not subject to any agreement with the plaintiff in that case, Tucows nevertheless consented to personal jurisdiction in Virginia. 2007 U.S. Dist. LEXIS 25887, [WL] at *6. However, *Bennett* has absolutely no bearing on the instant case, in which the plaintiff directly entered into a DNTA with Tucows, the plaintiff is clearly subject to the forum-selection clause contained within the agreement, and neither defendant has consented to jurisdiction before this Court.

[*41] Finally, the Court cannot find that Novak was so vulnerable or that there was such unequal bargaining power that the contract was procedurally unconscionable, given (1) plaintiff's sophistication in attempting to choose a registrar that would allow him to respond more easily to pending litigation (Am. Compl. P 39), (2) his extensive internet and business experience as owner of an extremely popular web company (Am. Compl. P 134), and (3) plaintiff's broad computer expertise, acquired over the past thirty years (Novak Decl. P 8).

Therefore, this Court cannot find that the forum selection clause at issue should not be enforced on the basis that Tucows' DNTA was either substantively or procedurally unconscionable.

### D. PUBLIC POLICY

In *The Bremen,* the Supreme Court stated that forum selection clauses should not be enforced if "enforcement would contravene a strong public policy of the forum in which suit is brought." 407 U.S. at 18 (citing *Boyd v. Grand Trunk W.R. Co.,* 338 U.S. 263, 70 S. Ct. 26, 94 L. Ed. 55 (1949)). Plaintiff alleges that enforcement of the forum selection clause in Tucows' DNTA counters New York state's public policy as expressed in New York General Business Law § 349 [*42] . Section 349 allows the state attorney general to bring civil actions on behalf of the people of New York state in order to enjoin unlawful deceptive acts or practices. N.Y. Gen. Bus. Law § 349. In addition, subsection (h) of the statute provides for an individual cause of action on the basis of such acts or practices. N.Y. Gen. Bus. Law § 349(h). Plaintiff curiously relies upon this Court's decision in *Gill v. World Inspection Network Int'l, Inc.,* which directly counters his position, in support of the proposition that litigating his case in a foreign forum would contravene Section 349. In *Gill,* the plaintiff argued that enforcement of an arbitral forum selection clause against franchisees contravened sections of the New York General Business Law that protect franchisees from fraudulent and unlawful practices by franchisors. 2006 U.S. Dist. LEXIS 52426, at *34-36. This Court held that "New York public policy does not operate to undermine the presumptive validity of the arbitral forum selection clause under the preemptive effect of the [Federal Arbitration Act]." 2006 U.S. Dist. LEXIS 52426 at *35. Likewise, there is nothing [*43] in Section 349 that undermines the presumptive validity of forum selection clauses as articulated by the Supreme Court and by this Circuit in *The Bremen, Shute,* and *Roby. See Person,* 456 F. Supp. 2d at 497 ("It is clear, from Second Circuit precedent, however, that far from being against public policy in this Court's jurisdiction, forum selection clauses are considered 'presumptively valid.'") (citing *Roby,* 996 F.3d at 1363). In fact, New York courts have consistently upheld forum selection clauses in which New York residents would be forced to litigate in another state or country on the basis that such clauses prevent confusion and costly litigation regarding where suits relating to the contract should be brought and defended, and reduce costs to the consumer by limiting the number of fora in which a case may be brought. *See, e.g., Effron,* 67 F.3d at 10 (finding it reasonable for cruise line to select a single venue for passenger suits) (quoting *Shute,* 499 U.S. at 593-94); *Hellex Car Rental Sys., Inc. v. Dollar Sys., Inc.,* No. 04-CV-5580, 2005

U.S. Dist. LEXIS 33858, at *16 (E.D.N.Y. Nov. 9, 2005) **[*44]** ("It is entirely reasonable for [defendant] to require that its franchisees agree to litigate disputes arising from the franchise relationship in Oklahoma, where its corporate headquarters are housed, rather than be required to defend suits in every state where its franchises may be located.") (citing *Carnival Cruise Lines, Inc.*, 499 U.S. at 593). As plaintiff is unable to show that enforcement of the forum selection clause in question would contravene New York public policy, the Court rejects his contention.

E. APPLICABILITY OF FORUM-SELECTION CLAUSE TO NITIN

Novak also contends that only his claims against Tucows are subject to dismissal pursuant to the forum-selection clause, and thus the case would be severed upon granting a motion to dismiss on this basis. However, this Court has discretion to dismiss the entire lawsuit for improper venue. While it serves only as persuasive authority, this Court finds it notable that the "Third, Seventh and Ninth Circuits have determined that, in certain circumstances, a non-signatory to a contract may be bound by a forum-selection clause found therein." *Hay Acquisition Co., I, Inc. v. Schneider,* No. 04-CV-1236, 2005 U.S. Dist. LEXIS 24490, at *25 (E.D. Pa. Apr. 29, 2005) **[*45]** (collecting cases). Further, at least two courts within this Circuit have held that "[i]t is well established that a 'range of transaction participants, parties and non-parties, should benefit from and be subject to forum selection clauses.'" *Weingrad,* 2005 U.S. Dist. LEXIS 26952, at *15-16 (quoting *Int'l Private Satellite Partners, L.P. v. Lucky Cat Ltd.,* 975 F. Supp. 483, 485-86 (W.D.N.Y. 1997) (internal citation omitted)). A non-party to an agreement may be bound by a forum selection clause where the party is "'closely related' to the dispute such that it becomes 'forseeable' that it will be bound." *Hugel v. Corp. of Lloyd's,* 999 F.2d 206, 209 (7th Cir. 1993) (citing *Manetti-Farrow, Inc. v. Gucci Am., Inc.,* 858 F.2d 509, 514 n.5 (9th Cir. 1988), and *Coastal Steel Corp. v. Tilghman Wheelabrator, Ltd.,* 709 F.2d 190, 203 (3d Cir. 1983)); *see also Weingrad,* 2005 U.S. Dist. LEXIS 26952, at *15-16 ("A non-party is 'closely related' to a dispute if its interests are 'completely derivative' of and 'directly related to, if not predicated upon' the signatory **[*46]** party's interests or conduct.") (quoting *Lipcon v. Underwriters at Lloyd's,* 148 F.3d 1285, 1299 (11th Cir. 1998) (internal citation omitted)). In this instance, plaintiff's claims against Nitin are nearly identical to those against Tucows. Furthermore, all of plaintiff's claims arise out of Novak's single transfer of his domain name, which was effected through both defendants in tandem. It was certainly foreseeable that any claims Novak might raise against Nitin in relation to the transfer could be subject to the terms contained in his agreement with Tucows. [11] Novak's attempt to evade the effect of the forum-selection clause merely by joining Nitin, a non-signatory to the DNTA, therefore fails. *See, e.g., Hodgson v. Gilmartin,* No. 06-CV-1944, 2006 U.S. Dist. LEXIS 73063, at *45 n.14 (E.D. Pa. Sept. 18, 2006) ("Plaintiff should . . . be prevented from avoiding the impact of a valid forum selection clause by suing [parties] who were not signatories to the Customer Agreement."); *Am. Patriot Ins. Agency, Inc. v. Mutual Risk Mgt., Ltd.,* 248 F. Supp. 2d 779, 785 (N.D.Ill. 2003) ("[W]e also reject Plaintiffs' argument that enforcement **[*47]** of the forum selection clause is precluded by the fact that certain Defendants are not parties to the Agreement. Plaintiffs cannot escape their contractual obligations simply by joining parties who did not sign the contract and then claiming that the forum selection clause does not apply.") (citations omitted), *rev'd on other grounds,* 364 F.3d 884, 889 (7th Cir. 2004).

**FOOTNOTES**

[11] Moreover, as a third-party beneficiary of the DNTA, Nitin is, "by definition," "closely related" to the dispute at issue and "forseeably" bound by the forum-selection clause. *Hugel,* 999 F.2d at 209-10 n.7 ("While it may be true that third-party beneficiaries of a contract would, by definition, satisfy the 'closely related' and 'foreseeability' requirements, *see e.g., Coastal Steel,* 709 F.2d at 203 (refusing to absolve a third-party beneficiary from the strictures of a forum selection clause which was foreseeable); *Clinton v. Janger,* 583 F. Supp. 284, 290 (N.D. Ill. 1984), a third-party beneficiary status is not required."); *see also* Defs.' Ex. T1, at P 1 ("'Services' refers to the domain name registration provided by us as offered through . . . the Registration Service Provider [Reseller]"); Defs' Ex. T1, at P 3 ("As consideration for the Services, you agree to pay the RSP the applicable service(s) fees.").

**[*48]** In sum, the Court finds that plaintiff has not demonstrated that enforcement of the forum-selection clause in this case would be unjust or unreasonable. Therefore, the Court finds that plaintiff has failed to demonstrate venue by a preponderance of the evidence, and grants defendants' motion to dismiss for improper venue. [12]

## FOOTNOTES

**12** Even if the burden to prove venue rested with defendants, rather than plaintiff, that burden would be easily met given the record in this case.

## VI. LANHAM ACT CLAIMS AND PENDENT STATE CLAIMS

Defendants also contend that plaintiff's Lanham Act claims of trademark infringement, trademark dilution and cybersquatting are fatally defective since it cannot be shown that Nitin or Tucows used Novak's alleged trademark, "petswarehouse," "in commerce." According to defendants, because use of "petswarehouse" "in commerce" is a required element of any potential claim that Novak could assert under the Lanham Act, such claims must be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) **[*49]** . (Nitin's Br., at 1-4 (citing *Savin Corp. v. Savin Group,* 391 F.3d 439 (2d Cir. 2004) (requiring "commercial use of the mark in commerce" to establish a trademark dilution claim)); Tucows' Br., at 11-15 (citing *Bosley Medical Institute v. Kremer,* 403 F.3d 672, 678-79 (9th Cir. 2005) (use of domain name incorporating plaintiff's mark in website critical of plaintiff does not constitute use in commerce), *Lockheed Martin Corp. v. Network Solutions, Inc.,* 194 F.3d 980, 984-85 (9th Cir. 1999) (registrar not liable for contributory infringement by issuing registration of potentially infringing domain names to third parties), and 15 U.S.C. § 1125(d) (requiring "bad faith intent to profit" from a mark to establish civil liability for cybersquatting under the Lanham Act).) Having concluded that venue is improper before this Court, the Court need not address defendants' motion to dismiss the Lanham Act claims or pendent state claims for failure to state a cause of action.

## VII. CONCLUSION

For the foregoing reasons, it is hereby ordered that plaintiff's motion to strike is GRANTED in part and DENIED in part. Defendant **[*50]** Tucows' motion to strike is GRANTED.

It is further ordered that both defendants' motions to dismiss on the basis of improper venue are GRANTED in their entirety.

SO ORDERED.

JOSEPH F. BIANCO

United States District Judge

Dated: March 26, 2007

Central Islip, NY

Service: **Get by LEXSEE®**
Citation: **2007 U.S. Dist. LEXIS 21269**
View: Full
Date/Time: Friday, February 15, 2008 - 2:56 PM EST

* Signal Legend:
● - Warning: Negative treatment is indicated
Q - Questioned: Validity questioned by citing refs
⚠ - Caution: Possible negative treatment
◆ - Positive treatment is indicated
A - Citing Refs. With Analysis Available
I - Citation information available
* Click on any *Shepard's* signal to *Shepardize®* that case.



About LexisNexis  | Terms & Conditions  | Contact Us
Copyright ©  2008 LexisNexis, a division of Reed Elsevier Inc. All rights reserved.